Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Priscilla Kam (PK 1505)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY COMPANY,

                                         Plaintiffs,

                         -against-

A.R.A MEDICAL CARE, P.C.,
SUHEL HUSSAIN AHMED, M.D.,
AHMED MEDICAL CARE, P.C.,
SHAIKH JAUHAR AHMED, M.D.,
HORIZON PT CARE, P.C.,
HANDS ON PHYSICAL THERAPY CARE, P.C., MOHAMED
HASSAN ALI ATTYA, P.T.,
TOP TAP ACUPUNCTURE, P.C.,
JUBILEE STAR ACUPUNCTURE, P.C.,
LILY JOU, L.AC.,
BNL ACUPUNCTURE, P.C.,
RUN HONG LI, L.AC.,
THERAPEUTIC CHIROPRACTIC SERVICES, P.C., DAVID
HERSHKOWITZ, D.C.,
SVETLANA KHOTENOK A/K/A LANA TROTMAN, AND
JOHN DOE DEFENDANTS NOS. 1-5.

                                      Defendants.

-----------------------------------------------------------------------------------X

Docket No.:_____ (     )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,720,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent No-Fault insurance charges relating to medically unnecessary, illusory, and otherwise un-reimbursable healthcare services, including spurious initial and follow-up examinations, outcome assessment testing, chiropractic services, acupuncture services, and physical therapy services (collectively, the "Fraudulent Services"), allegedly provided to New York automobile accident victims covered by policies of insurance issued by GEICO ("Insureds").

2.      The Fraudulent Services were the product of a multi-pronged scheme perpetrated by Defendants at a purported medical clinic located at 1552 Ralph Avenue, Brooklyn, New York (the "Brooklyn Clinic"), which has been illegally owned and controlled by unlicensed laypersons. To effectuate the scheme, the unlicensed laypersons first "purchased" the licenses of healthcare professionals in order to fraudulently incorporate, control, and operate healthcare professional corporations and professional "practices" at the Brooklyn Clinic. Second, the unlicensed laypersons solicited Insureds through kickbacks to "runners" and others in order to create a patient base at the Brooklyn Clinic. Third, the unlicensed laypersons used their control of the professional corporations and professional practices to implement a fraudulent, predetermined treatment protocol in order to enrich themselves by exploiting the Insureds' "No-Fault" insurance benefits.

2

3.     As part of the fraudulent scheme, the Defendants billed GEICO for a laundry-list of high frequency, repetitive and unnecessary treatments, using as "fronts" the licenses and tax identification numbers of an ever-changing number of healthcare professionals and professional corporations.  In fact, GEICO received billing for alleged treatments to Insureds at the Brooklyn Clinic from a "revolving door" of more than 100 different healthcare providers, including A.R.A Medical Care, P.C. ("ARA Medical"), Ahmed Medical Care, P.C. ("Ahmed Medical"), Horizon PT Care, P.C. ("Horizon PT"), Hands On Physical Therapy Care, P.C. ("Hand On PT"), Top Tap Acupuncture, P.C. ("Top Tap Acu"), Jubilee Star Acupuncture, P.C. ("Jubilee Star Acu"), BNL Acupuncture, P.C. ("BNL Acu"), Therapeutic Chiropractic Services, P.C. ("Therapeutic Chiro"), and Shaikh Jauhar Ahmed, M.D. ("the Fraudulent Dr. Shaikh Ahmed Practice").

4.     Through this action, GEICO seeks recovery of the substantial sums stolen from it, along with a declaration that it is not legally obligated to pay reimbursement of more than $1,900,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of ARA Medical, Ahmed Medical, Horizon PT, Hands On PT, Top Tap Acu, Jubilee Star Acu, BNL Acu, Therapeutic Chiro, and the Fraudulent Dr. Shaikh Ahmed Practice (collectively, the "Provider Defendants") because:

(i)     the Provider Defendants are fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons;

(ii)     the Provider Defendants submitted claims for Fraudulent Services that were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)     the billing codes used for the Fraudulent Services submitted under the names of the Provider Defendants misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

3

(iv)    the Provider Defendants engaged in illegal kickback, referral and fee-splitting arrangements with unlicensed individuals and entities as part of a scheme to defraud New York automobile insurers;  and

(v)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees.

5.    The Defendants fall into the following categories:

(i)    The Provider Defendants are medical, physical therapy, chiropractic and acupuncture professional corporations and practices through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Suhel Hussain Ahmed, M.D. ("Dr. Hussain Ahmed"), Shaikh Jauhar Ahmed, M.D. ("Dr. Shaikh Ahmed"), Mohamed Hassan Ali Attya, P.T. ("Attya"), Lily Jou, L.Ac. ("Jou"), Run Hong Li, L.Ac. ("Li"), and David Hershkowitz, D.C. ("Hershkowitz") (collectively, the "Nominal Owner Defendants"), are licensed healthcare professionals who falsely purport to own and control the Provider Defendants.

(iii)    Defendant Svetlana Khotenok a/k/a Lana Trotman ("Trotman") and John Doe Defendants Nos. 1-5 (collectively, the "Management Defendants") are persons and entities who have never been licensed healthcare professionals. Nevertheless, the Management Defendants secretly and unlawfully own, control and derive economic benefit from the Provider Defendants in contravention of New York law. Through their ownership and control of the Provider Defendants, the Management Defendants engaged in collusive kickback and fee-splitting arrangements, and caused Insureds to be referred amongst the Provider Defendants for the sole purpose of exploiting Insureds' No-Fault Benefits.

(iv)    John Doe Defendants Nos. 1-5 are persons and entities who are presently not identifiable but are associated with Trotman, and who are not licensed healthcare professionals but who illegally own and control the Provider Defendants and who have been involved in the fraudulent scheme committed against GEICO and other New York automobile insurers, along with Trotman.

6.    As discussed below, the Defendants at all relevant times have known that: (i) the Provider Defendants were fraudulently incorporated and/or unlawfully owned and controlled by

4

unlicensed laypersons and, therefore, were ineligible to bill for or to collect No-Fault benefits; (ii) the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) the Provider Defendants engaged in illegal kickback arrangements and/or unlawfully split fees with unlicensed individuals and entities, including the Management Defendants, as part of a scheme to defraud New York automobile insurers and, therefore, the Provider Defendants were ineligible to bill for or to collect No-Fault benefits; and (v) in many instances, the Fraudulent Services were provided  – to the extent that they were provided at all – by independent contractors rather than by the Provider Defendants or their employees.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

8.      The charts annexed hereto as Exhibits "1" – "9" set forth the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme began as early as 2012 and continues uninterrupted through present day.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,720,000.00.

## THE PARTIES

### I.   Plaintiffs

10.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

11.    Defendant Dr. Hussain Ahmed resides in and is a citizen of New York.   Dr. Hussain Ahmed was licensed to practice medicine in New York on June 27, 2008 and purports to own Defendant ARA Medical.

12.    Defendant ARA Medical is a fraudulently incorporated New York medical professional corporation, incorporated on October 1, 2012, with its principal place of business at the Brooklyn Clinic.

13.    Defendant Dr. Shaikh Ahmed resides in and is a citizen of New York.   Dr. Shaikh Ahmed was licensed to practice medicine in New York on September 15, 2008 and purports to own Defendant Ahmed Medical and the Fraudulent Dr. Shaikh Ahmed Practice.

14.    Defendant Ahmed Medical is a fraudulently incorporated New York medical professional corporation, incorporated on April 16, 2014, with its principal place of business at the Brooklyn Clinic.

15.    Defendant Attya resides in and is a citizen of New York.   Attya was licensed to practice physical therapy in New York on October 19, 2005 and purports to own Defendants Horizon PT and Hands On PT.

6

16.     Defendant Horizon PT is a fraudulently incorporated New York physical therapy professional corporation, incorporated on April 7, 2014, with its principal place of business at 225 Bay 44 Street, #3, Brooklyn, New York.

17.     Defendant Hands On PT is a fraudulently incorporated New York physical therapy professional corporation, incorporated on October 15, 2015, with its principal place of business at 225 Bay 44 Street, #3, Brooklyn, New York.

18.     Defendant Jou resides in and is a citizen of New York.  Jou was licensed to practice acupuncture in New York on October 25, 2011 and purports to own Defendants Top Tap Acu and Jubilee Star Acu.

19.     Defendant Top Tap Acu is a fraudulently incorporated acupuncture professional corporation, incorporated on October 22, 2013, with its principal place of business at 314 Alexander Avenue, Bronx, New York.

20.     Defendant Jubilee Star Acu is a fraudulently incorporated acupuncture professional corporation, incorporated on July 13, 2015, with its principal place of business at 314 Alexander Avenue, Bronx, New York.

21.     Defendant Li resides in and is a citizen of New York.  Li became licensed to practice acupuncture in New York on December 18, 2002 and purports to own Defendant BNL Acu.

22.     Defendant BNL Acu is a fraudulently incorporated acupuncture professional corporation, incorporated on August 8, 2016, with its principal place of business at 1720 Avenue U, Brooklyn, New York.

7

23.     Defendant Hershkowitz resides in and is a citizen of New Jersey.  Hershkowitz became a licensed chiropractor in New York on April 18, 2006 and purports to own Defendant Therapeutic Chiro.

24.     Defendant Therapeutic Chiro is a fraudulently incorporated New York chiropractic professional corporation, incorporated on November 22, 2011, with its principal place of business at 2350 Broadway, Suite 1001A, New York, New York.

25.     Defendant Trotman resides in and is a citizen of New York.  Trotman is a non-physician who at all times has conspired and participated in the fraudulent scheme alleged in this Complaint, including illegally owning and controlling the Brooklyn Clinic and the Provider Defendants with others (including John Doe Defendants Nos. 1-5), engaging in illegal kickbacks, unlawful referral arrangements and fee splitting, and establishing and implementing a predetermined fraudulent treatment and billing protocol to support the excessive and medically unnecessary Fraudulent Services.

26.     John Doe Defendants Nos. 1 – 5 reside in and are citizens of New York.  John Doe Defendants Nos. 1 – 5 are individuals and entities, presently not identifiable, who are not and never have been licensed healthcare professionals, yet – together with Trotman – own, control, and derive economic benefit from the operation of the Brooklyn Clinic and the Provider Defendants in contravention of New York law, and engage in illegal kickback and fee splitting arrangements with the Provider Defendants and direct the fraudulent, predetermined treatment and billing protocol at the Brooklyn Clinic.

8

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

28.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     An Overview of the No-Fault Laws and Licensing Statutes

30.     GEICO underwrites automobile insurance in New York.

31.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

32.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

33.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

34.     The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

35.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet New York State or local licensing requirements necessary to provide the underlying services.

36.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

37.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that healthcare providers that fail to comply with licensing

requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

38. In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.

39. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

40. New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

41. New York's Education Law also prohibits aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services.

42. Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

43. Furthermore, pursuant to the No-Fault Laws, only healthcare service providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits.

There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss .... <u>directly</u> to the applicant or, ... upon assignment by the applicant .... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law... . (emphasis supplied).

44.    For a healthcare service provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

45.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

46.    When a healthcare service provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

12

47.     Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare service provider to GEICO and all other insurers must be verified by the healthcare service provider subject to – in substance – the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime … .

## II.     The Defendants' Fraudulent Scheme

48.     Beginning in 2012, Defendants masterminded and executed a series of interrelated, complex fraudulent schemes wherein the Provider Defendants – owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants – were used to bill GEICO and the New York automobile insurance industry for millions of dollars in No-Fault insurance benefits they were never entitled to receive.

49.     To effectuate the scheme, the Management Defendants gained control of the Brooklyn Clinic and created various healthcare practices – using licensed healthcare professionals as sham owners of those practices – to implement a fraudulent, predetermined, billing and treatment protocol established by the Management Defendants and designed solely to maximize profits without regard to genuine patient care.

50.     The Management Defendants colluded with the Nominal Owner Defendants to carefully exploit the No-Fault Laws to elicit monies from GEICO and other New York automobile insurers for which they were legally barred from procuring.

51.     Using the Brooklyn Clinic as the epicenter of their operations, the Management Defendants' fraudulent scheme included: (i) "purchasing" the licenses of the Nominal Owner Defendants; (ii) using those licenses to illegally incorporate, own, and/or control the Provider

Defendants; (iii) paying "runners" – individuals who, for pecuniary benefit, solicit patients at the direction of the Management Defendants to treat at the Brooklyn Clinic – to build and maintain a steady patient base that could be subjected to the Management Defendants' predetermined treatment protocol; (iv) engaging in illegal kickback and/or fee splitting arrangements; and (v) using the Provider Defendants as conduits to submit fraudulent No-Fault billing to GEICO and other New York automobile insurers pursuant to the predetermined fraudulent treatment protocol they established.

52.     In addition to paying runners to solicit patients to treat at the Brooklyn Clinic, at times, the Management Defendants, or others working under the Management Defendants' direction and control, offered cash incentives directly to patients in order to induce them to treat or to continue treating at the Brooklyn Clinic.

53.     Once recruited to "treat" at the Brooklyn Clinic, Insureds, at the direction of the Defendants, underwent spurious examinations with ARA Medical or Ahmed Medical, and, as a result of the bogus diagnoses and recommendations listed in the examination reports, were then systematically directed to commence a course of unnecessary and excessive treatment – including chiropractic care, acupuncture and physical therapy – with the modality healthcare providers operating from the Brooklyn Clinic including Defendants Horizon PT, Hands On PT, Top Tap Acu, Jubilee Star Acu, BNL Acu and Therapeutic Chiro.

54.     The Defendants also directed Insureds to treat, or purport to treat, with a variety of transient providers who paid kickbacks to the Management Defendants in order to access the Brooklyn Clinic's patient base so as to subject as many Insureds as possible to a host of illusory and excessive diagnostic tests, solely to maximize the billing submitted to GEICO and exploit the Insureds' No-Fault benefits.

55.     In fact, the Management Defendants required the Nominal Owner Defendants to systematically refer Insureds to the other Provider Defendants operating at the Brooklyn Clinic and for diagnostic testing with transient providers, and required the Nominal Owner Defendants to prescribe durable medical equipment ("DME") and pharmaceutical products to Insureds in order to maintain "employment" at the Brooklyn Clinic.

56.     The Brooklyn Clinic, though ostensibly organized to provide a range of health care services to Insureds at a single location, has at all times been under the control of the Management Defendants who organized and created it to be a convenient, one-stop shop for No-Fault insurance fraud.

57.     The Brooklyn Clinic has been the source of huge volumes of No-Fault billing for years, though the Defendants disguised the volume of billing by constantly changing the names of the professional corporations and healthcare providers to limit the amount of billing submitted through any single healthcare professional or entity at the Brooklyn Clinic.

58.     In fact, GEICO has received billing from an ever-changing list of more than 100 different healthcare providers that have operated from the Brooklyn Clinic at one time or another, purportedly rendering and billing for a high volume of medically unnecessary healthcare services.  These healthcare providers have included, but are not limited to, multiple medical practices, chiropractic practices, acupuncture practices, diagnostic testing practices, physical therapy practices, and psychology practices.   Often times several providers of the same specialty simultaneously submitted billing to GEICO for services rendered to Insureds treating at the Brooklyn Clinic.

59.     Many of the healthcare providers that have billed GEICO in the past for purportedly rendering services to Insureds at the Brooklyn Clinic have been identified by the

U.S. Government as being used "solely" in furtherance of an organized No-Fault fraud crime ring. See, United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO). These providers include Golden Star Medical Diagnostics, P.C., Sky Medical Diagnostics, P.C., SM Chiropractic, P.C., Bronx Chiropractic Services P.C., Fitness Physical Therapy, P.C., Comprehension PT, P.C., Victory Medical Diagnostics, P.C., Accurate Medical Diagnostics, P.C., Exultant Medical Diagnostics, P.C., Mobility Experts Medical, P.C. and Valley Psychological P.C.

60.     Notwithstanding the frequent change of professional corporations and healthcare providers at the Brooklyn Clinic, there was never any genuine "sale," "transfer," or "dissolution" of a healthcare practice or professional corporation by any legitimate professional owner working at the Brooklyn Clinic.

61.     Notwithstanding the frequent change of professional corporations and healthcare providers at the Brooklyn Clinic, there was never any genuine change in the nature of the Fraudulent Services allegedly rendered, or the type and nature of the billings submitted to GEICO.

62.     At the Brooklyn Clinic, the Management Defendants dictated which professional corporations and healthcare providers could operate under their direction and control, when they could operate, what services they could perform (or purport to perform) and when they should be shut down.

63.     Often times, despite the change in professional corporation, the Nominal Owner Defendant remained the same.  The Management Defendants merely incorporated a new professional corporation using the name and license of the Nominal Owner Defendant already working at the Brooklyn Clinic under the control of the Management Defendants.

64.     The "reincarnation" of one professional corporation to another at the Brooklyn Clinic pursuant to the Management Defendants' directives often correlated with the timing of GEICO's investigations into the operations of the former healthcare professional corporation's billing and treatment practices and was designed to continue to conceal the fraud from GEICO and other New York insurers.

A.     **The Fraudulent Incorporation, Ownership and Operation of the Provider Defendants**

65.     The Nominal Owner Defendants were all recruited at one time or another by the Management Defendants to serve as sham owners of the Provider Defendants.

66.     The Provider Defendants were fraudulently incorporated or created to replace other healthcare professional corporations operating from the Brooklyn Clinic – including some of the other Provider Defendants – in an effort to evade detection by GEICO and allow the Defendants' to continue their fraudulent conduct.

67.     In order to circumvent New York law and to induce the New York State Education Department to issue a certificate of authority authorizing the Provider Defendants to operate as healthcare professional corporations or to permit them to operate as legitimately controlled professional practices, the Management Defendants entered into secret schemes with the Nominal Owner Defendants.  Specifically, in exchange for a designated salary or other form of compensation from the Management Defendants, the Nominal Owner Defendants agreed to falsely represent in the certificates of incorporation and related filings with New York State that they were the true shareholders, directors, officers or owners of the Provider Defendants, and that they truly owned, controlled, and practiced through them.

68.     The Nominal Owner Defendants falsely represented in the certificates of incorporation and related filings with New York State that they were the true shareholders,

17

directors, officers, and owners of the Provider Defendants, and that they truly owned, controlled, and practiced through the professional corporations and professional practices, knowing that the Provider Defendants would be used to submit fraudulent billing to insurers.

69.     Although the Nominal Owner Defendants were listed as the record owners of the Provider Defendants on the certificates of incorporation, or otherwise identified as the licensed professionals controlling the professional practices, the Nominal Owner Defendants exercised no genuine ownership or control over the Provider Defendants or the profits that were generated through them.

70.     At all times, supervisory control and true ownership of the Provider Defendants rested in the hands of the Management Defendants who controlled the day-to-day operations at the Brooklyn Clinic.

71.     The Nominal Owner Defendants have never been the true shareholders, directors, officers, or owners of the Provider Defendants, and never had any true ownership interest in or control over their respective professional corporations and practices.  True ownership and control over the Provider Defendants has always rested entirely with the Management Defendants, who used the facade of the Provider Defendants to do indirectly what they are forbidden from doing directly, namely: (i) employ medical professionals; (ii) control those medical professionals' practices; and (iii) charge for and derive an economic benefit from their services.

72.     The Nominal Owner Defendants did not establish their own practices, but rather "walked" into the Brooklyn Clinic which had its own pre-existing patient base that was created and controlled by the Management Defendants.

73.     The Nominal Owner Defendants did not invest any "start-up" or "acquisition" monies out of their own pockets to create and/or maintain the "practices" at the Brooklyn Clinic.

18

74.     The Nominal Owner Defendants did not have their own patients, and did nothing to attract patients or create a patient base for the "practices" at the Brooklyn Clinic.

75.     The Nominal Owners did not advertise or market their association with the Provider Defendants to the general public.

76.     The Provider Defendants did not advertise or market their services to the general public.

77.     The Management Defendants, rather than the Nominal Owner Defendants, created and controlled the patient base at the Brooklyn Clinic.

78.     The Nominal Owner Defendants and the Provider Defendants relied on the Management Defendants for access to patients, as the Management Defendants themselves were the true owners and controllers of the Brooklyn Clinic and the healthcare practices that operated under the names of the Provider Defendants.

79.     The Brooklyn Clinic's patient base was established and maintained through a network of paid runners who received cash kickbacks or other incentives for each Insured they delivered to Brooklyn Clinic that could be subjected to medically useless treatment rendered through the Provider Defendants.

80.     At times, the Management Defendants offered cash incentives directly to Insureds in order to induce the Insureds to treat or continue treating at the Brooklyn Clinic.

81.     The Management Defendants, after paying off the runners for patient referrals, paid drivers to ensure that at least some patients were picked up and transported to the Brooklyn Clinic so that they could create and maintain a patient base, or the appearance of a patient base, for the Fraudulent Services billed to GEICO.

82.     The payments by the Managements Defendants to the runners and drivers that amassed the patient base at the Brooklyn Clinic were monies that the Management Defendants illegally siphoned from the Provider Defendants and/or obtained from them in the form of unlawful kickbacks and payments for referrals.

83.     Once Insureds arrived at the Brooklyn Clinic for treatment, the Management Defendants dictated the medical services that each Insured received from the Provider Defendants, regardless of the actual medical needs of the individual Insureds.

84.     The Management Defendants established predetermined treatment protocols in order to bill for voluminous, unnecessary, and excessive treatments that were provided (or purported to be provided) regardless of the actual medical needs of each individual Insured.

85.     Throughout the course of the Nominal Owner Defendants' relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants was vested entirely with the Management Defendants.

86.     The Management Defendants' decision-making authority relating to the operation and management of the Brooklyn Clinic and the Provider Defendants included control over the treatment protocols, including what treatments, testing and other services the Insureds received, what referrals and prescriptions the Insureds received, and what healthcare provider or professional corporations would render or provide those services.

87.     The Management Defendants decision-making authority also included the hiring and firing of all employees, including the healthcare professionals and technicians who allegedly performed the Fraudulent Services and the administrative employees.

88.     The healthcare professionals, technicians and administrative personnel working at the Brooklyn Clinic were either independent contractors or employees of the Brooklyn Clinic

and the Management Defendants; they were never employees of the Provider Defendants or the Nominal Owner Defendants.

89.     The Management Defendants decision-making authority also included control over how the Fraudulent Services were billed to insurers, including GEICO, who performed the billing services on behalf of the Brooklyn Clinic, and how the profits of the Provider Defendants were dispersed.

90.     Moreover, the Nominal Owner Defendants did not control or maintain the Provider Defendants' books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the Provider Defendants' financial affairs; never controlled the Provider Defendants' accounts receivables; and were unaware of fundamental aspects of how the Provider Defendants operated.

91.     In reality, the Nominal Owner Defendants were never anything more than de facto employees of the Management Defendants who at all times remained firmly in control of all entities, healthcare services, patients and profits generated at the Brooklyn Clinic.

i.     **The Fraudulent Incorporation of ARA Medical**

92.     In or about 2012, the Management Defendants recruited Dr. Hussain Ahmed, a licensed physician who was willing to "sell" them the use of his medical license so that the Management Defendants could fraudulently incorporate ARA Medical and use that entity as the main medical practice at the Brooklyn Clinic.

93.     Once ARA Medical was fraudulently incorporated on October 1, 2012, Dr. Hussain Ahmed ceded true beneficial ownership and control over the professional corporation to the Management Defendants.  Thereafter, the Management Defendants caused ARA Medical to commence operations at the Brooklyn Clinic.

21

94.     ARA Medical, under the control of the Management Defendants, purported to render and bill for boilerplate and unnecessary initial examinations, follow-up examinations and "outcome assessment testing".

95.     The Management Defendants used the spurious diagnoses resulting from the examinations and "outcome assessment testing" to justify bogus referrals to other providers operating at the Brooklyn Clinic, essentially "passing around" the Insureds among the different providers in order to maximize the Defendants' profits by subjecting the Brooklyn Clinic's patients to as many of the Fraudulent Services as possible.

96.     Notably, the Defendants submitted bills to GEICO for services rendered by ARA Medical under two different tax identification numbers ("TINs").

97.     ARA Medical's use of two different TINS served no legitimate purpose other than to evade detection by GEICO of the voluminous and fraudulent billing by a single provider entity.

    ii.    **The Fraudulent Incorporation of Ahmed Medical and the Fraudulent Use of Dr. Shaikh Ahmed's Personal TIN**

98.     In order to evade detection of their fraudulent scheme and to circumvent any investigation into the operation of ARA Medical, the Management Defendants directed and arranged to cease rendering and billing for services under ARA Medical and, in early 2014, recruited Dr. Shaikh Ahmed – Dr. Hussain Ahmed's brother-in-law – who was willing to "sell" his medical license to the Management Defendants and permit them to fraudulently incorporate Ahmed Medical and use it to submit thousands of fraudulent charges to insurers.

99.     Once Ahmed Medical was fraudulently incorporated on April 16, 2014, Dr. Shaikh Ahmed ceded true beneficial ownership and control over the professional corporation to

the Management Defendants. Thereafter, the Management Defendants caused Ahmed Medical to commence operations at the Brooklyn Clinic.

100. Notably, the treatment patterns of ARA Medical continued under Ahmed Medical which purported to render and bill for boilerplate and unnecessary initial examinations, follow-up examinations and "outcome assessment testing". As with ARA Medical, the examinations and tests were used solely to justify bogus referrals to other providers operating at the Brooklyn Clinic in order to maximize the Defendants' profits by subjecting the Brooklyn Clinic's patients to as many of the Fraudulent Services as possible.

101. Moreover, to further evade detection by GEICO of their fraudulent treatment practices, the Management Defendants convinced Dr. Shaikh Ahmed to allow them to also submit bills to GEICO under his personal TIN.

102. Dr. Shaikh Ahmed's willingness to "sell" his medical license to the Management Defendants permitted them to fraudulently control and operate the Fraudulent Dr. Shaikh Ahmed Practice at the Brooklyn Clinic, and to use his name, license and personal TIN to submit numerous additional fraudulent charges to insurers.

103. As with ARA Medical and Ahmed Medical, the Defendants submitted claims to GEICO for boilerplate and medically unnecessary initial examinations, follow-up examinations and "outcomes assessment testing" under Dr. Shaikh Ahmed's personal TIN.

104. Shortly after the Management Defendants started to submit billing under Dr. Shaikh Ahmed's personal TIN and began operating the Fraudulent Dr. Shaikh Ahmed Practice at the Brooklyn Clinic, the Defendants began to split the billing for examinations and "outcome assessment testing" between Dr. Shaikh Ahmed's personal TIN and Ahmed Medical's TIN.

23

105.    Specifically, the Defendants billed all initial and follow-up examinations under Dr. Shaikh Ahmed's personal TIN, and all "outcome assessment testing" under Ahmed Medical's TIN.  The Defendants split the billing based on the services rendered despite the fact that, in most cases, the examinations and "outcome assessment testing" were performed on the same Insureds on the same dates of service.

106.    The bills submitted for "outcome assessment testing" under Ahmed Medical are for the same Insureds and same dates of services as the examinations billed for under Dr. Shaikh Ahmed's personal TIN.

### iii.    The Fraudulent Incorporation of Horizon PT

107.    In or about 2014, the Management Defendants recruited Attya, a licensed physical therapist, who was willing to "sell" them the use of his physical therapy license so that the Management Defendants could fraudulently incorporate Horizon PT and use that entity to submit thousands of fraudulent charges to insurers for physical therapy services allegedly rendered at the Brooklyn Clinic.

108.    Notably, Attya was an alleged employee of All Kind Physical Therapy, P.C. – the physical therapy professional corporation that operated from the Brooklyn Clinic prior to Horizon PT.  Additionally, Horizon PT "employed" several other physical therapists that were purportedly employed by All Kind Physical Therapy, P.C.

109.    Once Horizon PT was fraudulently incorporated on April 7, 2014, Attya ceded true beneficial ownership and control over the professional corporation to the Management Defendants.  Thereafter, the Management Defendants caused Horizon PT to commence operations at the Brooklyn Clinic.

110.   Horizon PT, under the control of the Management Defendants, rendered and billed the same exact treatment for virtually every Insured, including an initial physical therapy evaluation followed by months of physical therapy in the form of electrical stimulation treatment, hot/cold packs and therapeutic exercises.

### iv.   The Fraudulent Incorporation of Hands On PT

111.   In or about 2015, in order to continue evading detection by GEICO of their fraudulent scheme, the Management Defendants, who already controlled Attya's physical therapy license, fraudulently incorporated Hands On PT and began to use that entity to submit thousands of fraudulent charges to insurers for physical therapy services allegedly rendered at the Brooklyn Clinic.

112.   Hands On PT was simply the latest "name" used by the Management Defendants to submit fraudulent physical therapy bills to insurers for services allegedly rendered at the Brooklyn Clinic.

113.   As with Horizon PT, once Hands On PT was fraudulently incorporated on October 27, 2015, Attya ceded true beneficial ownership and control of the professional corporation to the Management Defendants.   Thereafter, the Management Defendants caused Hands On PT to commence operations at the Brooklyn Clinic.

114.   The treatment patterns of Horizon PT continued under Hands On PT in that virtually every patient received an initial physical therapy evaluation followed by months of physical therapy treatment including electrical stimulation therapy, hot/cold packs and therapeutic exercises.

115. There was no legitimate reason for the Defendants' to cease operating under Horizon PT and to commence operating under Hands On PT other than to evade detection by GEICO of voluminous and fraudulent billing for physical therapy services.

### v. The Fraudulent Incorporation of Top Tap Acu

116. In or about 2013, the Management Defendants recruited Jou, a licensed acupuncturist, who was willing to "sell" them the use of her acupuncture license so that the Management Defendants could fraudulently incorporate Top Tap Acu and use that entity to submit thousands of fraudulent charges to insurers for acupuncture services allegedly rendered at the Brooklyn Clinic.

117. Once Top Tap Acu was fraudulently incorporated on October 22, 2013, Jou ceded true beneficial ownership and control over the professional corporation to the Management Defendants. Thereafter, the Management Defendants caused Top Tap Acu to commence operations at the Brooklyn Clinic.

118. Top Tap Acu, under the control of the Management Defendants, rendered and billed the same exact treatment for virtually every Insured, including initial examinations, followed by months of acupuncture treatment that consisted of five units of acupuncture (representing 61-75 minutes of treatment) per date of service for each Insured.

### vi. The Fraudulent Incorporation of Jubilee Star Acu

119. In or about 2015, in order to continue evading detection by GEICO of their fraudulent scheme, the Management Defendants, who already controlled Jou's acupuncture license, fraudulently incorporated Jubilee Starr Acu and began to use that entity to submit thousands of fraudulent bills to insurers for acupuncture services allegedly rendered at the Brooklyn Clinic.

120.    Jubilee Star Acu was simply the latest "name" used by the Management Defendants to submit fraudulent acupuncture bills to insurers for services allegedly rendered at the Brooklyn Clinic.

121.    As with Top Tap Acu, once Jubilee Star Acu was fraudulently incorporated on July 13, 2015, Jou ceded true beneficial ownership and control of the professional corporation to the Management Defendants.  Thereafter, the Management Defendants caused Jubilee Star Acu to commence operations at the Brooklyn Clinic.

122.    The treatment patterns of Top Tap Acu continued under Jubilee Star Acu in that virtually every patient received an initial examination followed by months of acupuncture treatment in which Jubilee Star Acu purportedly rendered, and then billed to GEICO, five units of acupuncture (representing 61-75 minutes of treatment) per date of service for each Insured.

123.    There was no legitimate reason for the Defendants to cease operating under Top Tap Acu and to commence operating under Jubilee Star Acu other than to evade detection by GEICO of voluminous and fraudulent billing for acupuncture services.

### vii.    The Fraudulent Incorporation of BNL Acu

124.    In or about 2016, in order to continue evading detection by GEICO of their fraudulent scheme, the Management Defendants, recruited Li, a licensed acupuncturist, who was willing to "sell" them the use of his acupuncture license so that the Management Defendants could fraudulently incorporate BNL Acu and use that entity to submit thousands of fraudulent charges to insurers for acupuncture services allegedly rendered at the Brooklyn Clinic.

125.    BNL Acu is simply the latest "name" used by the Management Defendants to submit fraudulent acupuncture bills to insurers for services allegedly rendered at the Brooklyn Clinic.

126.   Once BNL Acu was fraudulently incorporated on August 8, 2016, Li ceded true beneficial ownership and control of the professional corporation to the Management Defendants. Thereafter, the Management Defendants caused BNL Acu to commence operations at the Brooklyn Clinic.

127.   The treatment patterns of Top Tap Acu and Jubilee Star Acu continued under BNL Acu in that virtually every patient received an initial examination followed by months of acupuncture treatment in which BNL Acu purportedly rendered, and then billed to GEICO, five units of acupuncture (representing 61-75 minutes of treatment) per date of service for each Insured.

128.   There was no legitimate reason for the Defendants' to cease operating under Jubilee Star Acu and to commence operating under BNL Acu other than to evade detection by GEICO of voluminous and fraudulent billing for acupuncture services.

### viii.   The Fraudulent Incorporation of Therapeutic Chiro

129.   In or about 2011, the Management Defendants recruited Hershkowitz, a licensed chiropractor, who was willing to "sell" them the use of his chiropractic license so that the Management Defendants could fraudulently incorporate Therapeutic Chiro and use that entity to submit thousands of fraudulent charges to insurers for chiropractic services allegedly rendered at the Brooklyn Clinic.

130.   Once Therapeutic Chiro was fraudulently incorporated on December 22, 2011, Hershkowitz ceded true beneficial ownership and control of the professional corporation to the Management Defendants.  Thereafter, the Management Defendants caused Therapeutic Chiro to commence operations at the Brooklyn Clinic.

28

131.   Therapeutic Chiro, under the control of the Management Defendants, rendered and billed for chiropractic initial and follow-up examinations and standard chiropractic manipulations as part of the fraudulent predetermined billing and treatment protocol implemented at the Brooklyn Clinic.

**B.   The Management Defendants' Efforts to Conceal Their Ownership and Control of the Provider Defendants Through Sham Financial Arrangements**

132.   The Management Defendants used each of the Provider Defendants as a means to illegally profit from professional healthcare services by engaging sham financial relationships, including unlawful fee splitting, that funneled large sums of money to themselves in contravention of New York law.

133.   The Management Defendants, in an effort to conceal their illegal financial relationships, while simultaneously effectuating pervasive total control over the Provider Defendants' operation and management, arranged to have the Nominal Owner Defendants and the Provider Defendants enter into a series of "management," "billing," "collection," "transportation," "lease," and/or "marketing" agreements or other financial arrangements.

134.   These agreements and financial arrangements called for exorbitant payments from the Provider Defendants to the Management Defendants.

135.   These agreements and financial arrangements were purportedly for the performance of certain designated services including "management", "marketing", "billing", "collections", "leasing", and "transportation", among others.  However, these were actually sham agreements and arrangements which far exceeded fair market value for the services allegedly provided and which were meant to conceal the Management Defendants' illegal ownership and control over the Provider Defendants.

29

136.     In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to create the illusion that the Provider Defendants were paying legitimate fees for "management," "billing," "collection," "transportation," "marketing" services and/or for facility space and equipment, but they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own and control the Provider Defendants, and (ii) siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

137.     The net effect of these "management", "billing", "collection," "transportation," "marketing," "lease," and/or other agreements and financial arrangements, was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations and healthcare practices, their alleged owners, their accounts receivable, and any revenues that might be generated therefrom.

138.     The Management Defendants' unlawful ownership and control of the Provider Defendants compromised patient care because the provision of health services through the Provider Defendants was entirely subject to the pecuniary interests of its unlicensed owners rather than the independent medical judgment of a true medical professional.

**C.     The Defendants' Fraudulent Treatment and Billing Protocol**

139.     As part of the fraudulent scheme, the Brooklyn Clinic's patient base was established through a network of individuals known as "runners" who were paid by the Management Defendants for each Insured they delivered to the Brooklyn Clinic that could be

subjected to a host of illusory medical services rendered and billed to GEICO through the Provider Defendants.

140.    The Provider Defendants then, at the direction of the Management Defendants, steered patients to each other by way of bogus referrals for medically unnecessary services in order to maximize the billing the Defendants submitted or caused to be submitted to No-Fault automobile insurers.

141.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

142.    The Defendants provided their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment.

143.    Each step in the fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

### i.    The Fraudulent Initial Examinations

144.    The Defendants purported to provide virtually every Insured with an initial examination which resulted in strikingly similar diagnoses and caused the examining provider to recommend nearly identical, predetermined treatment plans for virtually all Insureds requiring them to the return to the Brooklyn Clinic several times per week for months on end for a litany

of spurious healthcare services including excessive physical therapy, chiropractic manipulation, acupuncture treatment and diagnostic testing.

145.    From 2012 through 2014, Dr. Hussain Ahmed and other medical professionals performed, or purported to perform, the initial examinations at the Brooklyn Clinic through ARA Medical.  Thereafter, in 2014 when the Management Defendants decided to cease billing under ARA Medical in order to evade detection of their fraudulent scheme, the initial examinations were billed through the Fraudulent Dr. Shaikh Ahmed Practice and Ahmed Medical.

146.    As stated above, the Management Defendants billed for initial examinations rendered by Dr. Shaikh Ahmed both through the Fraudulent Dr. Shaikh Ahmed Practice using Dr. Shaikh Ahmed's personal TIN and through Ahmed Medical.

147.    Notably, despite the fact that the Management Defendants transitioned from billing for initial examinations under ARA Medical to billing them under Ahmed Medical and the Fraudulent Dr. Shaikh Ahmed Practice, the fraudulent treatment protocols surrounding the rendering and billing of the initial examinations remained intact.  (ARA Medical, Dr. Hussain Ahmed, the Fraudulent Dr. Shaikh Ahmed Practice, Ahmed Medical and Dr. Shaikh Ahmed are collectively referred to as the "Examination Defendants").

148.    The initial examinations were performed – to the extent that they were performed at all – to provide Insureds with predetermined diagnoses to allow the Defendants to then provide a host of medically unnecessary or illusory services.

149.    The initial examinations, in fact, were form documents with check boxes and pre-printed choices which the examining doctor would circle, with few other comments or narration beyond the markings in boxes or circling of pre-printed diagnoses/symptoms.

32

150.   The template examination forms and reports were provided to the Examination Defendants by the Management Defendants and the Examination Defendants were required to use these template forms in order to maintain employment at the Brooklyn Clinic.

151.   In fact, despite the fact that ARA Medical and Ahmed Medical and the Fraudulent Dr. Shaikh Ahmed Practice are allegedly owned by two different doctors – Dr. Hussain Ahmed and Dr. Shaikh Ahmed, respectively – both used the exact same template examination report form in performing their initial examinations and submitted this report to GEICO in support of their billing for initial examinations.

152.   The Examination Defendants, at the direction of the Management Defendants, virtually always billed the initial examinations to GEICO under current procedural terminology ("CPT") code 99205, representing a 60-minute examination and resulting in a charge of $236.94.

153.   The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed pursuant to the fraudulent treatment protocols established by the Management Defendants.

154.   CPT code 99205 is described in the New York State Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, as:

> Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A comprehensive history; A comprehensive examination; Medical decision making of high complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity.  Physicians typically spend 60 minutes face-to-face with the patient and/or family. (Emphasis added).

155. The Examination Defendants' charges for the initial examinations were fraudulent in that: (i) the initial examinations were medically unnecessary and were performed pursuant to the Management Defendants' direction and control; (ii) the CPT code the Examination Defendants billed misrepresented the extent of the initial examinations and the nature of the underlying service; (iii) the initial examination reports misrepresented the nature, extent and complexity of the Insureds' injuries; and (iv) the initial examinations virtually never took 60 minutes to perform, to the extent that they were performed at all.

156. According to the Fee Schedule, the use of CPT code 99205 requires that the Insured presented with problems of moderate-to-high severity.

157. By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

158. Even so, the Examination Defendants routinely billed for the initial examinations under CPT code 99205, and thereby falsely represented that the Insureds presented with problems of moderate-to-high severity.

159. The Examination Defendants routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for their charges for the examinations under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at higher rates than examinations involving presenting problems of low severity.

160. The Examination Defendants also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the

Insureds, including diagnostic testing, chiropractic services, acupuncture services and physical therapy services.

161.    What is more, even though the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

162.    In addition, the use of CPT code 99205 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family. Though the Examination Defendants routinely billed for the initial examinations under CPT code 99205, none of the medical professionals associated with the Examination Defendants spent 60 minutes with any Insureds during the initial examinations.

163.    In keeping with the fact that the initial examinations allegedly provided by the Examination Defendants did not entail 60 minutes of face-to-face time with the Insureds or their families, the template examination forms (provided by the Management Defendants) used by the Examination Defendants in purporting to conduct the initial examinations set forth a limited range of examination parameters.

164.    The only face-to-face time between the examining physicians and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems. These brief interviews and limited examinations did not entail 60 minutes of face-to-face time with the Insureds or their families.

35

165.    In their claims for initial examinations, the Examination Defendants falsely represented that the examinations involved at least 60 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at a higher rate than examinations that require less time to perform.

166.    When the Defendants billed for the initial examinations under CPT code 99205, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations and consultations.

167.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of virtually all body systems, not only the body systems that are related to the patient's present complaint. A "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the patient.

168.    Rather, after purporting to provide the initial examinations, the Examination Defendants prepared reports designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers through the Provider Defendants.

169.    Furthermore, the Examination Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate to high complexity." In actuality the initial examinations did not involve any such decision-making because the Insureds never presented with injuries or symptoms that would necessitate decision making of moderate-to-high complexity.

36

170. In the unlikely event that an Insured did present with injuries or symptoms that required decision making of moderate-to-high complexity, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

171. Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

172. First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Provider Defendants for "treatment," they did so without any medical records.

173. Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying them.

174. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the healthcare services provided by the medical professionals associated with the Provider Defendants, to the extent that any such services or treatment options were provided in the first instance.

175. Third, in virtually every case, none of the Examination Defendants considered any significant number of diagnoses or treatment options for Insureds during the initial

37

examinations. Rather, to the extent that the initial examinations were conducted in the first instance, the Examination Defendants, and/or independent contractors working on their behalves, made routine, predetermined "diagnoses" for every Insured, and prescribed a substantially identical course of treatment for every Insured – which included physical therapy, chiropractic treatment and acupuncture treatment rendered by other healthcare providers operating from the Brooklyn Clinic – without regard to any individual Insured's actual medical condition or needs.

176.    In keeping with the fact that the Examination Defendants never considered any significant number of diagnoses or treatment options for the patients treating at the Brooklyn Clinic, for virtually every Insured the Examination Defendants checked off the following choices under the "Diagnostic and Treatment Plan" section of the initial examination reports:

- MRI [] to rule out discogenic injury
- Start/continue physical therapy
- Chiropractic evaluation recommended
- Acupuncture evaluation recommended
- Consider orthopedic surgery consultation to assess MRI and documented musculoskeletal injuries
- Neurological evaluation recommended to evaluate cerebral concussion and/or radiculopathy
- Psychological evaluation recommended to evaluate posttraumatic stress
- Range of motion and muscle strength test to determine and monitor progress or dysfunction
- FCE to determine patient's degree of disability and readiness to return to work (the template examination form does not even provide a section for work history)
- VSNCT tests

177.    Though the Examination Defendants, at the direction of the Management Defendants, routinely billed for their putative initial examinations using CPT code 99205, and thereby falsely represented that the initial examinations involved "moderate to high complexity" medical decision-making, in fact the initial examinations did not involve any legitimate medical decision-making at all.

178.    Rather, to the extent that the initial examinations were conducted in the first instance, physicians associated with the Examination Defendants made boilerplate, predetermined "diagnosis" for Insureds, and prescribed a virtually identical course of extensive and unnecessary treatment for each Insured.

179.    In the claims for initial examinations under CPT code 99205, the Examination Defendants falsely represented that the initial examinations involved medical decision-making of moderate-to-high complexity in order to provide a false basis to bill for the initial examinations under CPT code 99205, because CPT code 99205 is reimbursable at a higher rate than examinations that do not require moderate-to-high complexity medical decision-making.

### ii.    The Fraudulent Follow-Up Examinations

180.    In addition to the fraudulent initial examinations, the Examination Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations pursuant to the fraudulent treatment protocol implemented by the Management Defendants at the Brooklyn Clinic.

181.    As with the initial examinations, follow-up examinations were purportedly rendered and billed to GEICO through ARA Medical from 2012 through 2014. Thereafter, in 2014 when the Management Defendants decided to cease billing under ARA Medical in order to evade detection of their fraudulent scheme, the follow-up examinations were billed through the Fraudulent Dr. Shaikh Ahmed Practice and Ahmed Medical.

182.    The Management Defendants billed for follow-up examinations rendered by the Fraudulent Dr. Shaikh Ahmed Practice using Dr. Shaikh Ahmed's  his personal TIN and through Ahmed Medical.

183. Despite the fact that the Management Defendants transitioned from billing for follow-up examinations under ARA Medical to billing them under Ahmed Medical and the Fraudulent Dr. Shaikh Ahmed Practice, the fraudulent treatment protocols surrounding the rendering and billing of the follow-up examinations remained intact.

184. The Examination Defendants, under the direction and control of the Management Defendants, typically billed follow-up examinations using CPT code 99215, representing a 40-minute examination and resulting in a charge of $148.69.

185. Like the Examination Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

186. The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

187. According to the Fee Schedule, the use of CPT code 99215 typically requires that the Insured present with problems of "moderate to high severity." As previously stated, the Insureds never presented with problems of this severity, and if they did, the deficient follow-up examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

188. In the claims for follow-up examinations, the Examination Defendants, at the direction of the Management Defendants, routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99215, because follow-up examinations billable

40

under CPT code 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity.

189.    The Examination Defendants also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis to continue referring Insureds for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including diagnostic testing, chiropractic services, acupuncture services and physical therapy services rendered through the Provider Defendants.

190.    Additionally, CPT code 99215 typically requires that the physician spend 40 minutes of face-to-face time with the Insured or the Insured's family. Though the Examination Defendants routinely billed for the follow-up examinations under CPT code 99215, none of the medical professionals associated with the Examination Defendants spent 40 minutes with any Insureds or their families during the follow-up examinations.

191.    In keeping with the fact that none of the medical professionals associated with the Examination Defendants ever spent 40 minutes of face-to-face time with the Insureds and/or the Insureds' families, the Examination Defendants used pre-printed checklist or template forms in conducting the follow-up examinations.

192.    As with the initial examination template forms (i) the follow-up examination template forms and reports were provided to the Examination Defendants by the Management Defendants; (ii) the Examination Defendants were required to use these template forms in order to maintain employment at the Brooklyn Clinic; and (iii) despite the fact that ARA Medical and Ahmed Medical and the Fraudulent Dr. Shaikh Ahmed Practice are allegedly owned by two different doctors, both professional corporations use the same exact template follow-up examination report forms to perform their follow-up examinations.

41

193.    The pre-printed checklist and template forms that the Examination Defendants used in conducting the follow-up examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

194.    In keeping with the fact that the follow-up examinations were performed pursuant to fraudulent, predetermined billing and treatment protocols designed to maximize profit without regard to individual patient care, virtually every follow-up examination report completed by the Examination Defendants has the following pre-printed recommendations:

> <u>PATIENT IS PROVIDED WITH FOLLOWING MEDICAL SUPPLIES TO BE USED TO ALLEVIATE THE PAIN:</u>
>
> T.E.N.S. UNIT
> THERMOPHORE
>
> <u>TESTS TO BE DONE</u>:
> - MRI
> - CT SCAN
> - X-RAY
> - EMG/NCV

195.    All that was required to complete the pre-printed checklist and template forms was a brief patient interview and a very brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

196.    These interviews and examinations did not require any physicians associated with the Examination Defendants to spend more than 10 minutes of face-to-face time with the Insureds during the putative follow-up examinations.

197.    In their claims for follow-up examinations, the Examination Defendants, at the direction of the Management Defendants, falsely represented that the examinations involved at

least 40 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99215, because examinations billable under CPT code 99215 are reimbursable at a higher rate than examinations that require less time to perform.

198.   Furthermore, the Examination Defendants routinely falsely represented that their follow-up examinations involved medical decision-making of "moderate to high complexity."

199.   In addition, when the Examination Defendants submitted charges for the follow-up examinations under CPT code 99215, they falsely represented that the physicians associated with the Examination Defendants performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity."

200.   In performing the follow-up examinations, the physicians associated with the Examination Defendants did not take a "comprehensive" history; did not conduct a "comprehensive" evaluation; nor did the engage in decision making of "high complexity."

201.   In actuality the follow-up examinations did not involve any such decision-making because the Insureds never presented with injuries or symptoms that would necessitate decision making of moderate to high complexity.  In the unlikely event that an Insured did present with such injuries or symptoms, the deficient follow-up examinations were incapable of assessing and/or diagnosing them as such.

202.   In the claims for follow-up examinations, the Examination Defendants falsely represented that the examinations included a comprehensive patient history, a comprehensive physical examination, and medical-decision making of high complexity because follow-up examinations billable under CPT code 99215 are reimbursable at higher rates than less-detailed examinations.

203.    Based on the follow-up examination reports, Insureds were directed to return to the Brooklyn Clinic to continue treating with the Provider Defendants several times per week for additional medically unnecessary follow-up examinations and medically unnecessary physical therapy, acupuncture treatment, chiropractic services and a myriad of diagnostic testing – all pursuant to the predetermined treatments protocols established and imposed by the Management Defendants.

### iii.    The Fraudulent "Outcome Assessment Testing"

204.    In addition to the other Fraudulent Services, the Management Defendants, pursuant to their fraudulent billing and treatment protocol, caused bills to be submitted to GEICO representing that the Examination Defendants frequently subjected Insureds to multiple medically useless "outcome assessment tests" on or around the same dates they purported to subject the Insureds to initial or follow-up examinations.

205.    Critically, in keeping with the fact that the Management Defendants exercised complete ownership and control over the Provider Defendants, both Dr. Shaikh Ahmed and Dr. Hussain Ahmed independently advised GEICO that they never performed "outcome assessment tests" on any of the patients treating at the Brooklyn Clinic, nor did they refer any of the Brooklyn Clinic patients for this test.

206.    Nevertheless, as with the initial and follow-up examinations, the "outcome assessment testing" was purportedly rendered and billed to GEICO through ARA Medical from 2012 through 2014.   Thereafter, in 2014 when the Management Defendants decided to cease billing under ARA Medical in order to evade detection of their fraudulent scheme, the "outcome assessment testing" was billed through the Fraudulent Dr. Shaikh Ahmed Practice and Ahmed Medical.

207.    The Management Defendants billed for "outcome assessment tests" rendered by the Fraudulent Dr. Shaikh Ahmed Practice using Dr. Shaikh Ahmed's personal TIN and through Ahmed Medical.

208.    Notably, in another attempt to evade detection by GEICO of their fraudulent, predetermined billing and treatment protocol, shortly after the Management Defendants began to submit billing through the Fraudulent Dr. Shaikh Ahmed Practice using Dr. Shaikh Ahmed's personal TIN, they "split" the billing for examinations and "outcome assessment tests" between the Fraudulent Dr. Shaikh Ahmed Practice and Ahmed Medical.

209.    Specifically, the Defendants billed all "outcome assessment testing" under Ahmed Medical and all examinations, both initial and follow-up, through the Fraudulent Dr. Shaikh Ahmed Practice. Considering that (i) Dr. Shaikh Ahmed is the alleged owner of Ahmed Medical; (ii) all examinations and "outcome assessment tests" were allegedly performed by Dr. Shaikh Ahmed; and (iii) virtually every patient received "outcome assessment testing" contemporaneous to their initial and follow-up examinations, there is no legitimate explanation for the Defendants to submit the billing for these services under both TINs other than to evade detection by GEICO of their fraudulent billing and treatment protocol.

210.    The Management Defendants billed the "outcome assessment tests" to GEICO using CPT code 99358, generally resulting in a charge of $204.41 for each round of "testing."

211.    Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to the fraudulent treatment protocol established by the Management Defendants.

45

212.    The "outcome assessment tests" that the Examination Defendants purportedly provided to Insureds – to the extent they were provided at all – were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their daily lives.

213.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that the Examination Defendants purportedly provided were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial examinations and follow-up examinations.

214.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination and then bill separately for contemporaneously-provided "outcome assessment testing."

215.    In the event the Examination Defendants did perform the "outcome assessment tests" for which GEICO was billed, the information gained through the use of these tests would not have been significantly different from the information that the Examination Defendants purported to obtain during virtually every Insured's initial examination and follow-up examinations.  In fact, the Examination Defendants, in billing for examinations using CPT codes 99205 and 99215, represented they took a "comprehensive" patient history and performed a "comprehensive" physical examination.

216.    Under the circumstances employed by the Management Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories purportedly conducted during the Insureds' initial examinations and follow-up examinations.

46

The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent it was rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

217.   The Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the Insured and his or her family.

218.   Though the Management Defendants routinely submitted billing under CPT Code 99358 for "outcome assessment tests" allegedly provided by the Examination Defendants, no physician associated with the Examination Defendants spent an hour reviewing or administering the tests. In fact, per Dr. Shaikh Ahmed and Dr. Hussain Ahmed, these "outcome assessment tests" were never performed or prescribed in the first instance.

219.   Nevertheless, the Defendants submitted billing to GEICO for thousands of dollars in fraudulent billing under CPT code 99358.

220.   In keeping with the fact that the Management Defendants exercised complete ownership and control over the Provider Defendants, the narrative summaries associated with the "outcome assessment tests" and that were submitted to GEICO through the Examination Defendants contained a verbatim description of the tests purportedly administered, a verbatim description of patient results and a verbatim description of treatment goals.

47

### iv.    The Fraudulent Acupuncture Treatment

221.    Consistent with the excessive and fraudulent provision of the healthcare services the Defendants purported to provide to Insureds at the Brooklyn Clinic, Top Tap Acu, Jubilee Star Acu, Jou, BNL Acu and Li (collectively, the "Acupuncture Defendants") purported to subject virtually every Insured to a series of medically unnecessary, repetitious and ineffective acupuncture treatments.

222.    Like the Defendants' charges for the other Fraudulent Services, the charges for acupuncture were fraudulent in that the acupuncture was medically unnecessary and was performed – to the extent it was performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants and the improper referral and financial arrangements amongst the Defendants.

223.    The predetermined, fraudulent acupuncture protocol was grounded on superficial examinations and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

224.    The Acupuncture Defendants, at the direction of the Management Defendants, purported to provide acupuncture services to Insureds solely to maximize billing submitted to insurers, including GEICO, without regard to the medical necessity of the services or the requirements for proper billing under New York's No-Fault Laws.

225.    Additionally, like their fraudulent tactics with ARA Medical and Ahmed Medical, the Management Defendants "reincarnated" the acupuncture professional corporation operating at the Brooklyn Clinic several times in order to evade detection by GEICO of their fraudulent scheme.

226.    Specifically, from 2013 through 2015 the Management Defendants caused all acupuncture treatment to be rendered and billed through Top Tap Acu.   In 2015, the Management Defendants caused Jou to cease rendering services through Top Tap Acu and used her acupuncture license (which they already controlled) to incorporate Jubilee Star Acu.

227.    All acupuncture treatment at the Brooklyn Clinic was rendered and billed through Jubilee Star Acu until July 2016.

228.    Thereafter, in August 2016, the Management Defendants recruited Li who was willing to "sell" them his acupuncture license so that they could incorporate BNL Acu.  BNL Acu continues to render and bill GEICO for acupuncture services purportedly rendered at the Brooklyn Clinic.

229.    The change in the name of the acupuncture professional corporations often coincided with the commencement of GEICO's investigations and requests for additional verification from the acupuncture providers.

230.    Notably, despite the alleged change in ownership of the acupuncture professional corporations, the fraudulent treatment and billing patterns with regard to the acupuncture treatment remained the same.

231.    Under the circumstances here, there was no legitimate reason to cease billing under one acupuncture professional corporation and to begin billing under a new acupuncture professional corporation – two of which were allegedly owned by the same acupuncturist and all of which operated from the same Brooklyn Clinic location – other than to evade detection by GEICO of the Defendants' fraudulent scheme.

a.   Legitimate Acupuncture Practices

49

232.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows.  Every individual has a unique energy flow ("Chi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma.  When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

233.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.  Since every individual has a unique Chi, acupuncture treatment should be individualized.  In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

234.    Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments.  Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health.

235.    Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's  progress throughout the course of treatment.

236.    In contrast to legitimate acupuncture practices, the Acupuncture Defendants treated each patient without regard to any necessary individual treatment strategies, without

regard to any necessary adjustments in treatment as treatment progressed over time, and without meaningful, genuine, and individualized documentation.

237.    The documents the Acupuncture Defendants submitted to GEICO in support of their charges for the purported acupuncture services demonstrate that no genuine effort was made to treat the patients' actual injuries, to properly assess their condition, to monitor their improvement or lack thereof, or to adjust the treatment to reflect the patients' improvement or lack of improvement.

238.    At best, the purported "acupuncture" services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and instead reflect a profit-driven predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

b.  The Acupuncture Defendants' Fraudulent Acupuncture Examinations

239.    The Acupuncture Defendants, at the direction of the Management Defendants, purported to begin treatment of nearly every Insured with an initial acupuncture examination billed under CPT code 99203 and resulting in a charge of $54.74.

240.    The charges for the initial acupuncture examinations were fraudulent in that the examinations were medically unnecessary and were performed pursuant to the Management Defendants' predetermined fraudulent billing and treatment protocol designed to maximize profits without regard to patient care.

241.    Furthermore, the Acupuncture Defendants' charges for the initial acupuncture examinations were fraudulent in that they misrepresented the extent of the examinations.

242.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity and that the examiner spend 30 minutes of face-to-face time with the Insured.

243.    By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

244.    Even so, in the claims for initial acupuncture examinations, the Acupuncture Defendants routinely billed for their putative examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems, to the limited extent that they actually had any presenting problems at all, were low-severity soft tissue injuries such as sprains and strains,.

245.    In the claims for initial acupuncture examinations, the Acupuncture Defendants routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity.

246.    The Acupuncture Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including acupuncture services.

247.    Additionally, though the Acupuncture Defendants routinely billed for the initial acupuncture examinations under CPT code 99203, no medical professional associated with the

Acupuncture Defendants ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial acupuncture examinations, to the extent that the examinations were conducted at all.

248.    In keeping with the fact that the initial acupuncture examinations never lasted 30 minutes – to the extent they were conducted at all – the Acupuncture Defendants used template forms in conducting the examinations which consisted primarily of pre-printed checklists and various diagnoses/symptoms for the acupuncturists to circle.   These pre-printed examination forms were designed for the convenience of the Acupuncture Defendants rather than to perform useful, individual assessments of the patients.

249.    The pre-printed checklist and template forms that the Acupuncture Defendants used in conducting the initial acupuncture examinations lacked any objective clinical findings and set forth a very limited range of potential patient complaints, potential diagnoses, and treatment recommendations.

250.    For example, the template forms (i) lacked any palpation findings such as muscle spasm, tenderness and swelling; (ii) lacked any visual assessment findings such as gait changes or postural distortions; and (iii) failed to assess ranges of motion or impairment to the Insureds' activities of daily living.

251.    Notably, Jou previously advised GEICO that she did not perform any objective tests other than a tongue and pulse examination and that a patient's blood pressure – a vital component necessary in the practice of acupuncture to diagnose a patient's condition and develop an acupuncture treatment plan – is "irrelevant".

252.    The only assessment of the Insureds' conditions was the Insureds own subjective complaints, and the "physical examination" allegedly performed by the Acupuncture Defendants

53

and the resulting diagnoses were nothing more than a simple reiteration of those complaints. All that was required to complete the pre-printed checklist and template forms was a brief patient interview and a superficial scan of the body. A sufficient physical examination was never performed.

253. These interviews and superficial "examinations" did not require any acupuncturists associated with the Acupuncture Defendants to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial acupuncture examinations.

254. In their claims for initial acupuncture examinations, the Acupuncture Defendants falsely represented that the examinations involved at least 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

255. In addition, according to the Fee Schedule, when the Acupuncture Defendants submitted charges for initial acupuncture examinations under CPT code 99203 they falsely represented that they took a "detailed" patient history.

256. Pursuant to the Fee Schedule, a "detailed" patient history requires – among other things – that the healthcare provider take (i) a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems; and (ii) a past, family, and social history from the patient to the extent that the patient's past, family, and social history is related to the patient's presenting problems.

257. While the Acupuncture Defendants routinely billed for the initial acupuncture examinations under CPT code 99203, and thereby represented that they took "detailed" patient histories from the Insureds they purported to treat during the initial acupuncture examinations,

they did not take a history of all of the body systems of any Insured, nor did they take a complete past, family, and social history from any Insured.

258.    In the claims for initial acupuncture examinations, the Acupuncture Defendants falsely represented that the examinations included a detailed patient history because examinations billable under CPT code 99203 are reimbursable at higher rates than less-detailed examinations.

259.    In keeping with the fact that the acupuncture examinations were performed – to the extent they were performed at all – pursuant to a fraudulent, predetermined billing and treatment protocol, the template examination reports submitted by the Acupuncture Defendants are strikingly similar and contain certain identical portions.

260.    For example, the initial examination template reports for both Jubilee Star Acu and BNL Acu (which are allegedly owned by two different acupuncturists) contain almost an identical "Physical Examination" check-list.

261.    Specifically Jubilee Star Acu's initial examination reports contain the following "Physical Examination" paragraph:

**Physical Examination:**

__ Headache: on & off / constant. Type: Cervical occipital / Frontal / Right Left Temporal / Eyes area.

__ Neck pain radiating to R / L / shoulder / arm / Rotation to R / L / flexion / extension / lateral R / L.

__ Shoulder pain R / L in deltoid / when raising arm abduction / adduction / reach forward / backward.

__ Upper extremity R / L / Both experiencing Numbness / tingling / pins and needles / weak sensation.

__ Upper / Fore arm / Elbow / Wrist / Hand R / L / Both: contusion / numbness / pain / pins and needles / tingling / tender with pressure / weakness. Other_____

__ Thoracic pain anterior / posterior_____

__ Low Back pain: Lumbar / Sacrum / Coccyx / Gluts / Hip. Fix / radiates down lateral / medial.

__ Thigh / Leg lateral / medial R / L: contusion / numbness / pain / tender with pressure / tingling / weakness.

__ Knee pain R / L / lateral / medial / anterior / posterior.

__ Calves / fibular / tibia: R / L: contusion / numbness / tender with pressure / tingling / weakness.

__ Ankle lateral / medial R / L: contusion / numbness / pain / tender with pressure / tingling / weakness.

__ Foot lateral / medial R / L: contusion / numbness / pain / tender with pressure / tingling / weakness.

262.    Likewise, BNL Acu's initial examination reports contain the following "Physical

Examination" paragraph:

263.    Moreover, every report submitted by BNL Acu contains an identical treatment

plan for every Insured which states:

TREATMENT PLAN
The objective of the acupuncture treatment are to promote the flow Wi and
Blood in the affected meridians symptomatic pain relief, relieve muscle
spasm and inactive local trigger point, no other discipline can render this

> service. The frequency of visit at the onset will be _____ times per week and will be modified when it is appropriate. Re-evaluation will be made after _____ weeks. Various sizes of needles will be used depending on patient's body place, treatment sites and patient's condition.

Notably, for virtually every Insured BNL Acu recommended treatment at a frequency of 3-4 times per week for four weeks.

264.    In keeping with the fact that the acupuncture examinations were performed pursuant to a fraudulent, predetermined billing and treatment protocol rather to treat the Insureds subjected to them, virtually every Insured was diagnosed with "Blood and Qi Stagnation" and oftentimes the affected channels reported by the Acupuncture Defendants did not correspond with the areas of complaint reported by the Insureds and listed in the "Physical Examination" section of the template forms.

265.    In addition to the fraudulent initial acupuncture examinations, the Acupuncture Defendants purported to provide at least one follow-up examination to virtually every Insured at the Brooklyn Clinic. Like the self-serving initial acupuncture examinations, the purpose of the follow-up examinations was to further inflate the billing the Defendants could submit to GEICO and to further justify the continued rendering of medically unnecessary, illusory, or otherwise un-reimbursable acupuncture treatment.

266.    The follow-up acupuncture examinations were virtually always billed to GEICO under CPT code 99212 resulting in a charge of $26.41.

267.    The charges for the follow-up acupuncture examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the extent of the evaluations allegedly performed; and (iii) misrepresented the extent of the medical decision-making during the examinations.

268.   As with the initial examinations reports, the follow-up examination reports were wholly insufficient and lacked any objective clinical findings.

269.   The follow-up acupuncture examinations were comprised of a simple boilerplate, template, checklist form which was used to conduct the examinations, and which set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

270.   To the extent that the follow-up examinations were conducted in the first instance, the Acupuncture Defendants provided a nearly identical, predetermined laundry-list of phony "diagnoses" for every Insured – which were comprised of nothing more than a reiteration of the Insureds' subjective complaints – and prescribed a virtually identical course of continued treatment for every Insured.

271.   Like the claims for the initial acupuncture examinations, the claims for follow-up acupuncture examinations are fraudulent in that the Acupuncture Defendants routinely falsely represented the extent of the examinations as well as the diagnoses and conditions of the Insureds for the sole purpose of justifying additional billing submitted by the Defendants for the Fraudulent Services.

272.   In keeping with the fact that the acupuncture services are rendered and billed under the control of the Management Defendants and pursuant to their fraudulent predetermined treatment and billing protocol, Jou advised GEICO that she rarely performed follow-up examinations, yet GEICO received bills seeking reimbursement for follow-up examinations allegedly performed by Top Tap Acu and Jubilee Star Acu under CPT code 99212 at a rate of $26.41 per examination.

c. The Acupuncture Defendants' Fraudulent Acupuncture Treatments and Billing

273.    Following the fraudulent initial examinations, the Acupuncture Defendants, at the direction of the Management Defendants, purported to provide acupuncture treatments that were billed to GEICO under CPT codes 97810, 97811, 97813, and 97814, among others.

274.    The purported "acupuncture" services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements.

275.    All Insureds were treated with virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progressed over time, and without meaningful, genuine, and individualized documentation.  As such, these acupuncture treatments were not medically necessary. Indeed, they were designed solely to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

276.    At best, the purported acupuncture services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insureds' conditions and were not designed to effectively treat or otherwise benefit the Insureds.   The Acupuncture Defendants' daily treatment notes indicate that the Acupuncture Points treated did not vary from patient to patient, and in many cases the notes indicate the Insureds' areas of complaint were not even treated.

277.    In keeping with the fact that the acupuncture services were rendered in an assembly-line fashion without regard to Insureds' individual conditions, the treatment notes failed to adequately assess the Insureds' current conditions, the severity of their complaints or the progression of their care.   In fact, treatment notes were often inconsistent noting at each visit that the Insureds were "better" despite no corresponding improvements in pain scales.

278.   The services billed for by the Acupuncture Defendants also reflect a lack of independent professional acupuncture judgment and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

279.   For instance, the number of needles used was often insufficient; the number and location of acupuncture points used were insufficient to justify the number of units billed; patients were universally getting a very high frequency of treatment (3-4 sessions per week over the course of several months) that was not supported by the alleged injuries and not adjusted to reflect the Insureds' improvement or lack thereof.

280.   The Acupuncture Defendants' predetermined fraudulent treatment protocol is further established by the Acupuncture Defendants routinely billing five units of acupuncture for each Insured on each date of service, purportedly consisting of up to 75 minutes of personal, one-on-one contact with each Insured.

281.   The Fee Schedule sets forth the billing codes and requirements for billing acupuncture services to insurers, as follows:

> Acupuncture should be billed in increments of 15 minutes of one-on-one contact between the acupuncturist and the patient in which the acupuncturist is performing a medically necessary component of the acupuncture. The length of time the needles remain in a patient and the amount of points/body parts in which needles are inserted is irrelevant. By way of example, if the acupuncturist spends 1-15 minutes of one-on-one contact with a patient, the acupuncturist may only bill for an initial insertion code (i.e., 97810 *or* 97813); if the acupuncturist spends 16-30 minutes of one-on-one contact with the patient it would be appropriate to bill an initial insertion code plus one reinsertion code; if the acupuncturist spends 31-45 minutes of one-on-one contact with a patient it would be appropriate to bill an initial insertion code plus two reinsertion codes; and if the acupuncturist spends 46-60 minutes of one-on-one contact with the patient it would be appropriate to bill an initial insertion code plus three reinsertion codes.

282.    The Defendants uniformly submitted or caused to be submitted, bills for acupuncture services representing five separate 15-minute segments of acupuncture treatment for each Insured, on each date of service representing 61-75 minutes of one-on-one contact with the Insureds.  In fact, the Acupuncture Defendants never spent 61-75 minutes of one-on-one contact with the Insureds.  Instead, the Acupuncture Defendants would insert the needles into an Insured – which takes no more than a few minutes – and would then set a timer only returning when the timer went off 15 minutes later.

283.    Moreover, the Acupuncture Defendants purported to render, and bill GEICO for, five units of acupuncture, representing 61-75 minutes of treatment, pursuant to a systemic pattern in which virtually every Insured on every date of service received an initial insertion of electrically stimulated acupuncture billed under CPT code 97813, followed by two units of reinsertion without electrical stimulation and two units of reinsertion with electrical stimulation billed using CPT codes 97811 (x2) and 97814 (x2), respectively.   The Acupuncture Defendants routinely failed to identify which Acupuncture Points received stimulation.

284.    Notably, Jou previously advised GEICO that her standard protocol was to treat all patients with electrically stimulated acupuncture unless they had a pacemaker, were pregnant or suffered from seizures.  Jou further advised GEICO that it was protocol to bill five units of acupuncture for each patient, comprised of one unit billed under CPT code 97813 followed by two units of CPT code 97814 and two units of CPT code of 97811, despite the fact that patients required less than 30 minutes of treatment.  Moreover, Jou advised GEICO that she left needles inserted into patients for increments of greater than 15 minutes solely to justify billing insurers for additional reinsertion codes.

285.   Moreover, the purported acupuncture treatment described in the Acupuncture Defendants' treatment notes in almost all cases fails to justify billing for more than one unit of acupuncture.   Specifically, virtually all patients received treatment to a minimal amount of Acupuncture Points with no more than a total of six needles, yet the Defendants regularly submitted billing for five units of acupuncture treatment representing 61-75 minutes of personal, one-on-one contact.

286.   The Acupuncture Defendants' fraudulent billing scheme misrepresented and exaggerated the level of services provided in order to inflate the charges submitted to GEICO. The Acupuncture Defendants uniformly submitted billing to GEICO for multiple segments of purported one-on-one contact rendered on the same day for each Insured, notwithstanding the fact that the "treatments" allegedly rendered by the Acupuncture Defendants were (or could have been) rendered in one treatment segment.

287.   In addition to the fraudulent billing and treatment protocols for standard acupuncture treatment, the Acupuncture Defendants further fraudulently inflated their billing by charging for an "adjunct" acupuncture procedure known as cupping.

288.   Cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area.   Once stagnant blood has been moved, additional cupping is unnecessary – yet the Acupuncture Defendants billed for cupping as a matter of course, without any evidence of need or effectiveness.

289.   The Acupuncture Defendants submitted claims for medically unnecessary cupping services under CPT code 97139 typically resulting in a charge of $16.70.   The Acupuncture Defendants often purported to provide cupping services to the same Insured multiple times in a single week in order to fraudulently inflate their billing.

290.   The Acupuncture Defendants' boilerplate approach to the acupuncture treatments that they purportedly performed, or caused to be performed, on virtually every Insured was designed solely to maximize the charges the Defendants could submit through the Provider Defendants to GEICO and other insurers, and to maximize their ill-gotten profits.

v.   **The Fraudulent Chiropractic Treatment**

291.   In addition to the other Fraudulent Services, the Defendants routinely subjected Insureds to a course of medically unnecessary chiropractic services.  The Defendants submitted or caused to be submitted bills for chiropractic services through Herschkowitz and Therapeutic Chiro (together, the "Chiropractic Defendants').

292.   As with the charges for the other Fraudulent Services, the charges for chiropractic services were fraudulent in that they were (i) medically unnecessary; (ii) performed pursuant to the exaggerated, unsubstantiated diagnoses set forth in the fraudulent initial chiropractic examinations and as part and parcel of the Defendants' fraudulent billing and treatment protocol; and (iii) provided pursuant to the improper referral and financial arrangements between the Defendants.

a.   The Fraudulent Chiropractic Examinations

293.   In addition to the fraudulent initial medical examinations, Insureds at the Brooklyn Clinic were also subjected to an initial chiropractic examination which served as "justification" to provide medically unnecessary, illusory, or otherwise un-reimbursable chiropractic treatment. The Chiropractic Defendants, at the direction of the Management Defendants, virtually always billed the initial chiropractic examinations to GEICO under CPT code 99203 resulting in a charge of $54.74.

294.    The charges for the initial chiropractic examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the amount of time spent on the examinations; (iii) misrepresented the extent of the evaluations allegedly performed; and (iv) misrepresented the extent of the medical decision-making during the examinations.

295.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

296.    By contrast, to extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains. However, the Chiropractic Defendants, in their claims for initial chiropractic examinations, routinely billed for the putative examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

297.    The Chiropractic Defendants, at the direction of the Management Defendants, routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity.

298.    The Chiropractic Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list

of other Fraudulent Services that the Defendants purported to provide to the Insureds, including chiropractic services.

299.   Additionally, pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the Insured or the Insured's family.

300.   As the Chiropractic Defendants submitted virtually all of their billing for initial chiropractic examinations under CPT code 99203, they thereby represented that the chiropractors who performed the initial examinations spent at least 30 minutes of face-to-face time with the Insureds or their families during the putative examinations.

301.   In fact, none of the chiropractors associated with Therapeutic Chiro actually spent 30 minutes performing the initial chiropractic examinations. To the extent that these examinations were performed in the first instance, they did not entail 30 minutes of face-to-face time between the examining chiropractors and the Insureds or their families.

302.   Rather, the initial chiropractic examinations were comprised of a simple boilerplate, template, checklist form which was designed for the Chiropractor Defendants' convenience in conducting the examinations, and which set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

303.   The only face-to-face time between the examining chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

304.   When the Chiropractic Defendants billed for the initial chiropractic examinations under CPT code 99203, they falsely represented that the chiropractors who purported to perform

the examinations performed "detailed" patient examinations on the Insureds they purported to treat during the examinations.

305.   In fact, with respect to the claims for initial chiropractic examinations under CPT code 99203, no chiropractor associated with the Chiropractic Defendants ever conducted an extended examination of the Insureds' musculoskeletal systems.

306.   These brief interviews and limited examinations did not require any chiropractor associated with the Chiropractic Defendants to spend 30 minutes of face-to-face time with the Insureds or their families.

307.   The Chiropractic Defendants falsely represented that the initial chiropractic examinations involved at least 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

308.   What is more, the Chiropractic Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial chiropractic examinations. Rather, to the extent that the examinations were conducted in the first instance, the Chiropractic Defendants provided a nearly identical, predetermined laundry-list of exaggerated "diagnoses" for every Insured, and prescribed a virtually identical course of treatment for every Insured. To the extent that the Insureds ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the neck and/back.

309.   In keeping with the fact that the chiropractic examinations were a fraudulent means to justify unsubstantiated diagnoses and the Defendants' billing for extensive medically

unnecessary treatment, at times the Chiropractic Defendants' "positive" examination findings were incorrect or unsupported by the documented clinical findings.

310.    Furthermore, the diagnoses and treatment plans bore no actual relationship to the conditions actually presented, but were simply recited as a matter of course in order to justify the performance of the chiropractic services and other Fraudulent Services.

311.    In fact, every patient that treated with Therapeutic Chiro was placed on the same treatment plan which consisted of chiropractic manipulation 3-4 times per week for months on end.

312.    Clearly, the claims for initial chiropractic examinations are fraudulent in that the Chiropractic Defendants routinely falsely represented the extent of the examinations as well as the diagnoses and conditions of the Insureds for the sole purpose of justifying additional billing submitted by the Defendants for the Fraudulent Services.

313.    In addition to the fraudulent initial chiropractic examinations, the Chiropractic Defendants purported to provide at least one follow-up examination to virtually every Insured at the Brooklyn Clinic.

314.    Like the initial chiropractic examinations, the purpose of the follow-up examinations was to further inflate the billing the Defendants could submit to GEICO and to further justify the continued rendering of medically unnecessary, illusory, or otherwise un-reimbursable chiropractic treatment.

315.    The Chiropractic Defendants, at the direction of the Management Defendants, virtually always billed the follow-up chiropractic examinations to GEICO under CPT code 99203 resulting in a charge of $54.74.

67

316.    The charges for the follow-up chiropractic examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the extent of the evaluations allegedly performed; and (iii) misrepresented the extent of the medical decision-making during the examinations.

317.    The follow-up chiropractic examinations were comprised of a simple boilerplate, template, checklist form which was designed for the convenience of the Chiropractic Defendants when conducting the examinations, and which set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

318.    To the extent that the follow-up examinations were conducted in the first instance, the Chiropractic Defendants provided a nearly identical, predetermined laundry-list of exaggerated and unsubstantiated "diagnoses" for every Insured, and prescribed a virtually identical course of continued treatment for every Insured.

319.    Like the claims for the initial chiropractic examinations, the claims for follow-up chiropractic examinations are fraudulent in that the Chiropractic Defendants routinely falsely represented the extent of the examinations as well as the diagnoses and conditions of the Insureds for the sole purpose of justifying additional billing submitted by the Defendants for the Fraudulent Services.

b.  The Fraudulent Chiropractic Treatment

320.    Following the fraudulent chiropractic examinations, the Chiropractic Defendants, at the direction of the Management Defendants, purported to provide Insureds with months of chiropractic manipulation therapy (the "Fraudulent Chiropractic Treatments") that was billed primarily under CPT code 98941.

321.  Like the other charges for Fraudulent Services, the charges for the chiropractic manipulation treatments were fraudulent in that the services were medically unnecessary and were performed pursuant to the Defendants' fraudulent predetermined billing and treatment protocol.

322.  Insureds were subjected to multiple sessions of Fraudulent Chiropractic Treatments per week over a period of many months, generally resulting in thousands of dollars of charges for each Insured.  The purported results of the other Fraudulent Services (i.e. medical examinations, chiropractic examinations and "outcome assessment testing") were used by the Defendants as justification for continued rounds of Fraudulent Chiropractic Treatments despite the fact the Chiropractic Defendants never incorporated the so-called "findings" of the other Defendants or the results of the other Fraudulent Services into the Fraudulent Chiropractic Treatments.

323.  Nor was there ever any assessment or modification of the chiropractic manipulation therapy as a result of the other Defendants' findings or the other Fraudulent Services.  In fact, the Chiropractic Defendants never modified an Insured's chiropractic care regardless of the individual symptoms or actual response to the treatment.

324.  The months of continued unchanging Fraudulent Chiropractic Treatments that were performed on virtually every Insured were not based on medical necessity and not intended to resolve the complaints/symptoms of the Insureds.  Instead, the "protocol" approach to the performance of the Fraudulent Chiropractic Treatments was designed solely to maximize the charges that the Defendants could submit to GEICO, and other automobile insurers, and to maximize the revenues that could be generated from each Insured who was subjected to the protocol at the Brooklyn Clinic.

### vi.    The Fraudulent Physical Therapy Treatment

325.    Consistent with the excessive and fraudulent provision of the healthcare services the Defendants purported to provide to Insureds at the Brooklyn Clinic, Horizon PT, Hands On PT and Attya (collectively, the "Physical Therapy Defendants"), at the direction of the Management Defendants, purported to subject virtually every Insured to a medically unnecessary physical therapy regimen.

326.    Like their fraudulent tactics with ARA Medical and Ahmed Medical and with Top Tap Acu, Jubilee Star Acu and BNL Acu, the Management Defendants "reincarnated" the physical therapy professional corporation operating at the Brooklyn Clinic in order to evade detection by GEICO of their fraudulent scheme.

327.    Specifically, from 2014 through 2015 the Management Defendants caused all physical therapy services to be rendered and billed through Horizon PT.  In late 2015, the Management Defendants caused Attya to cease rendering services through Horizon PT and used his physical therapy license (which they already controlled) to incorporate Hands On PT.

328.    Hands On PT continues to render and bill GEICO for physical therapy services purportedly rendered at the Brooklyn Clinic.

329.    Notably, despite the reincarnation of the physical therapy professional corporation, the fraudulent treatment and billing patterns with regard to the physical therapy services remained the same.

330.    Under the circumstances here, there is no legitimate reason to cease billing under one physical therapy professional corporation and to begin billing under a new physical therapy professional corporation – which is allegedly owned by the same physical therapist and operating

70

from the same location – other than to evade detection by GEICO of the Defendants' fraudulent scheme.

331.    Like the Defendants' charges for the other Fraudulent Services, the charges for physical therapy were fraudulent in that the services were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits and pursuant to the improper referral and financial arrangements between the Defendants.

332.    Specifically, as a result of the predetermined diagnoses alleged in the initial examinations performed by ARA Medical, Dr. Hussain Ahmed, Ahmed Medical and the Fraudulent Dr. Shaikh Ahmed Practice, virtually every insured was referred for a course of physical therapy that involved an identical treatment plan consisting of the same physical therapy modalities being rendered 3-4 times per week for months.

333.    Through this boilerplate treatment and billing protocol, the Physical Therapy Defendants, at the direction of the Management Defendants, purported to provide virtually every Insured with an initial physical therapy evaluation billed under CPT code 97001 and resulting in a charge of $72.92.   Thereafter, the Physical Therapy Defendants submitted the following charges for every date on which virtually every Insured purportedly received physical therapy services: (i) application of hot or cold packs, billed under CPT code 97010; (ii) 15 minutes of therapeutic exercises, billed under CPT code 97110; and (iii) electrical stimulation therapy, billed under CPT code 97014.

334.    The Physical Therapy Defendants purported to provide this identical physical therapy treatment plan to virtually every Insured, regardless of the Insureds' individual

circumstances or unique presentment, in order to submit as much billing as possible for physical therapy services, without regard for medical necessity.

**D.**   **The Fraudulent Billing for Services Provided by Independent Contractors**

335.   The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.  Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

336.   Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused

to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "10").

337.   Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the Provider Defendants for Fraudulent Services provided – to the extent they were provided at all – by independent contractors.

338.   To the extent they were performed in the first instance, many of the Fraudulent Services were performed by per diem physicians, physical therapists, acupuncturists, and technicians (the "Treating Providers") whom the Defendants treated as independent contractors.

339.   The Defendants treated the per diem Treating Providers as independent contractors and not direct employees of the Provider Defendants.

340.   The Treating Providers that rendered, or purported to render, the Fraudulent Services for or on behalf of the Provider Defendants were not supervised by the Nominal Owner Defendants when they rendered, or purported to render, services for or on behalf of the Provider Defendants.

341.   The Treating Providers that purported to render the Fraudulent Services on behalf of the Provider Defendants operated on a non-exclusive basis and followed irregular schedules based on their own availability and individual desires to perform the Fraudulent Services for the Provider Defendants.

342.   In fact, many of the alleged "employees" of the Provider Defendants submitted billing on behalf of multiple healthcare service providers operating at several multidisciplinary clinics.

343.   For example, GEICO has received billing for services rendered by Clausel Cadet, P.A. – an alleged employee of the Fraudulent Dr. Shaikh Ahmed Practice – as an alleged employee

of at least five other professional corporations. Notably, while Ms. Cadet is listed on the examination reports as the examining practitioner, the Fraudulent Dr. Shaikh Ahmed Practice never lists Ms. Cadet as the treating provider on the bills submitted to GEICO. Rather all services billed through the Fraudulent Dr. Shaikh Ahmed Practice list Dr. Shaikh Ahmed as the treating provider.

344.    GEICO has received billing for services rendered by Arelene Huey P.A. – an alleged employee of Ahmed Medical – as an alleged employee of at least four other professional corporations. Notably, while Ms. Huey is listed on the examination reports as the examining practitioner, Ahmed Medical never lists Ms. Huey as the treating provider on the bills submitted to GEICO. Rather all services billed through the Ahmed Medical list Dr. Shaikh Ahmed as the treating provider.

345.    GEICO has received billing for services rendered by Baorong Wang, L.Ac. – an alleged employee of Top Tap Acu and Jubilee Star Acu – as an alleged employee of at least seven other acupuncture professional corporations.

346.    GEICO has received billing for services rendered by Mason Chong, L.Ac. – an alleged employee of Jubilee Star Acu – as an alleged employee of at least five other acupuncture professional corporations. Notably, Jubilee Star Acu submitted billing to GEICO for services allegedly rendered by Mason Chong, L.Ac. under the license of Baorong Wang, L.Ac. despite the fact that, according to Defendant Jou, Baorong Wang, L.Ac. was never an employee of Jubilee Star Acu.

347.    GEICO has received billing for services rendered by Longyu Ma, L.Ac. – an alleged employee of BNL Acu – as an alleged employee of at least five other acupuncture professional corporations.

348.    GEICO has received billing for services rendered by Stewart Summers, D.C. – an alleged employee of Therapeutic Chiro – as an alleged employee of at least four other chiropractic professional corporations.

349.    GEICO has received billing for services rendered by Bilal Hussain Shah, D.C. – an alleged employee of Therapeutic Chiro – as an alleged employee of at least four other chiropractic professional corporations.

350.    In addition, the Defendants:

(i)     paid the Treating Providers, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the Treating Providers that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the Treating Providers;

(iv)    failed to secure and maintain W-4 or I-9 forms for the Treating Providers;

(v)     failed to withhold federal, state or city taxes on behalf of the Treating Providers;

(vi)    compelled the Treating Providers to pay for their own malpractice insurance at their own expense;

(vii)   permitted the Treating Providers to set their own schedules and days on which they desired to perform the Fraudulent Services;

(viii)  permitted the Treating Providers to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices; and

(ix)    failed to cover the Treating Providers for either unemployment or workers' compensation benefits.

351.    By electing to treat the Treating Providers as independent contractors, the Defendants realized significant economic benefits – for instance:

75

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the treating providers.

352.   Because the Treating Providers were independent contractors, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with the services performed by them.

353.   The Defendants, however, billed for the services performed by the Treating Providers as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**E.     The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

354.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the PC Defendant to GEICO seeking payment for services for which the Defendants were not entitled to receive payment.

355.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in that they were professional healthcare corporations or practices that were fraudulently incorporated and/or unlawfully owned and controlled by, and split fees with, the Management Defendants, who are not licensed medical professionals.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the healthcare services were medically necessary and that the services actually were performed. In fact, many of the services were not medically necessary. To the extent the healthcare services were performed, they were performed pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them, and were provided pursuant to the improper referral and financial arrangements between the Defendants.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants in many instances misrepresented and exaggerated the nature and level of the services that purportedly were provided.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were rendered by independent contractors as opposed to the Provider Defendants ' employees.

**F.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

356.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

357. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

358. Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently owned and controlled and unlawfully split fees with unlicensed persons, and therefore are ineligible to bill for or collect No-Fault Benefits.

359. For example, the Defendants misrepresented ownership of and control over the Provider Defendants in filings with the New York State Department of Education, so as to (i) induce the New York State Department of Education ("DOE") to issue the licenses required to permit the Provider Defendants to engage in the practice of a licensed profession; (ii) induce the DOE to continue to recognize the Provider Defendants as being legally organized and authorized to practice their respective professions; and/or (iii) induce the DOE to allow the licensed professionals to continue to lawfully practice their profession, despite the control of their licenses by unlicensed laypersons.

360. The Management Defendants also entered into various financial arrangements with the Provider Defendants that were designed to, and did, conceal their true ownership of and control over the Provider Defendants, as well as their unlawful kickback arrangements and illegal fee splitting.

361. Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent predetermined protocols designed to

maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

362.   In addition, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly concealed the fact that the Defendants misrepresented and exaggerated the level and nature of the services purportedly provided, and inflated the billing to insurers.

363.   What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

364.   GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

365.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

366.   The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

367.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,720,000.00 based upon the fraudulent charges.

368.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

369.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

370.     There is an actual case in controversy between GEICO and the Defendants regarding more than $1,900,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the names of the Provider Defendants.

371.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants were fraudulently incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities, and illegally operating.

372.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants engaged in unlawful and/or fee-splitting arrangements with unlicensed individuals and entities as part of a

scheme to defraud New York automobile insurers and therefore, were ineligible to bill for or to collect No-Fault benefits.

373. The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Fraudulent Services were provided pursuant to the improper referral and financial arrangements between the Defendants.

374. The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

375. The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

376. The Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were provided by independent contractors, rather than by the Provider Defendants' employees.

377. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> (i) the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because they were fraudulently incorporated, and/or illegally owned and/or controlled by non-physicians and, therefore, are ineligible to seek or recover no-fault benefits;

(ii)    the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because they engaged in a scheme to defraud through unlawful kickback and fee-splitting arrangements;

(iii)   the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were medically unnecessary and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, predetermined protocols designed solely to maximize charges to GEICO, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them;

(iv)   the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the CPT codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(v)    the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were rendered by independent contractors rather than employees of the Provider Defendants.

## SECOND CAUSE OF ACTION
### Against Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

378.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

379.   ARA Medical Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

380.   Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of ARA Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years

seeking payments that ARA Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

381. ARA Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 operated ARA Medical, inasmuch as ARA Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for ARA Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through ARA Medical to the present day.

382. ARA Medical is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned

and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. ARA Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ARA Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

383.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,000.00 pursuant to the fraudulent bills submitted by the Defendants through ARA Medical.

384.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 (Violation of RICO, 18 U.S.C. § 1962(d))

385.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

386.    ARA Medical Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

387.    Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the ARA Medical enterprise.

388.    Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the

conduct of ARA Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that ARA Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

389.    Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

390.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,000.00 pursuant to the fraudulent bills submitted by the Defendants through ARA Medical.

391.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5**
**(Common Law Fraud)**

392.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

393.    ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

394.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ARA Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that ARA Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every

claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

395. ARA Medical, Dr. Hussain, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ARA Medical that were not compensable under the No-Fault Laws.

396. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,000.00 pursuant to the fraudulent bills submitted by the Defendants through ARA Medical.

397. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

398. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5**
**(Unjust Enrichment)**

399. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

400. As set forth above, ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

401.   When GEICO paid the bills and charges submitted by or on behalf of ARA Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

402.   ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

403.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

404.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $80,000.00.

## SIXTH CAUSE OF ACTION
### Against Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

405.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

406.   Ahmed Medical Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

407.   Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Ahmed Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two years

seeking payments that Ahmed Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

408.    Ahmed Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 operated Ahmed Medical, inasmuch as Ahmed Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Ahmed Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Ahmed Medical to the present day.

409.    Ahmed Medical is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned

and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Ahmed Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Ahmed Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

410. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through Ahmed Medical.

411. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

412. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

413. Ahmed Medical Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

414. Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the Ahmed Medical enterprise.

415. Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the

conduct of Ahmed Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Ahmed Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

416. Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

417. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through Ahmed Medical.

418.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5
### (Common Law Fraud)

419.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

420.    Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

421.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Ahmed Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Ahmed Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every

claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

422.    Ahmed Medical, Dr. Shaikh, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ahmed Medical that were not compensable under the No-Fault Laws.

423.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through Ahmed Medical.

424.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

425.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

## NINTH CAUSE OF ACTION
### Against Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5
### (Unjust Enrichment)

426.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

427.    As set forth above, Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

428.     When GEICO paid the bills and charges submitted by or on behalf of Ahmed Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

429.     Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

430.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

431.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $71,000.00.

### TENTH CAUSE OF ACTION
**Against Dr. Shaikh Ahmed, the Fraudulent Dr. Shaikh Ahmed Practice, Trotman
and John Doe Defendants 1-5
(Common Law Fraud)**

432.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

433.     Dr. Shaikh Ahmed, the Fraudulent Dr. Shaikh Ahmed Practice, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

434.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Dr. Shaikh Ahmed Practice was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

NYCRR § 65-3.16(a)(12), when in fact the Fraudulent Dr. Shaikh Ahmed Practice was owned and controlled by non-medical laypersons; (ii) in every claim, the representation that the Fraudulent Dr. Shaikh Ahmed Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Fraudulent Dr. Shaikh Ahmed Practice engaged in illegal kickback arrangements and fee-splitting with non-medical laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants and performed pursuant to the improper referral and financial arrangements between the Defendants, if performed at all.

435.    Dr. Shaikh, the Fraudulent Dr. Shaikh Ahmed Practice, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Fraudulent Dr. Shaikh Ahmed Practice that were not compensable under the No-Fault Laws.

436.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $32,000.00   pursuant to the fraudulent bills submitted by the Defendants through the Fraudulent Dr. Shaikh Ahmed Practice.

437.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

438.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

## ELEVENTH CAUSE OF ACTION
### Against Dr. Shaikh Ahmed, the Fraudulent Dr. Shaikh Ahmed Practice, Trotman and John Doe Defendants 1-5
### (Unjust Enrichment)

439.  GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

440.  As set forth above, Dr. Shaikh Ahmed, the Fraudulent Dr. Shaikh Ahmed Practice, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

441.  When GEICO paid the bills and charges submitted by or on behalf the Fraudulent Dr. Shaikh Ahmed Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

442.  Dr. Shaikh Ahmed, the Fraudulent Dr. Shaikh Ahmed Practice, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

443.  Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

444.  By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $32,000.00.

## TWELFTH CAUSE OF ACTION
### Against Attya, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

445.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

446.   Horizon PT Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

447.   Attya, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Horizon PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than twenty-three months seeking payments that Horizon PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

448.   Horizon PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Attya, Trotman and John Doe Defendants 1-5 operated Horizon PT, inasmuch as Horizon PT never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Horizon PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Horizon PT to the present day.

449.   Horizon PT is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.  Horizon PT likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Horizon PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

450.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $281,000.00 pursuant to the fraudulent bills submitted by the Defendants through Horizon PT.

451.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Attya, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(d))

452.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

453.    Horizon PT Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

454.    Attya, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the Horizon PT enterprise.

455.    Attya, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Horizon PT enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Horizon PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

456. Attya, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

457. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $281,000.00 pursuant to the fraudulent bills submitted by the Defendants through Horizon PT.

458. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Horizon PT, Attya, Trotman and John Doe Defendants 1-5
### (Common Law Fraud)

459. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

460. Horizon PT, Attya, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

461. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Horizon PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and

actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Horizon PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

462.    Horizon PT, Attya, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Horizon PT that were not compensable under the No-Fault Laws.

463.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $281,000.00 pursuant to the fraudulent bills submitted by the Defendants through Horizon PT.

464.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

465.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

## FIFTEENTH CAUSE OF ACTION
### Against Horizon PT, Attya, Trotman and John Doe Defendants 1-5
### (Unjust Enrichment)

466.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

467.    As set forth above, Horizon PT, Attya, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

468.    When GEICO paid the bills and charges submitted by or on behalf of Horizon PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

469.    Horizon PT, Attya, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

470.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

471.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $281,000.00.

## SIXTEENTH CAUSE OF ACTION
### Against Attya, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

472.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

473.    Hands On Physical Therapy Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

102

474.     Attya, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Hands On PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two years seeking payments that Hands On PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

475.     Hands On PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Attya, Trotman and John Doe Defendants 1-5 operated that Hands On PT, inasmuch as that Hands On PT never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for that Hands On PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail

fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through that Hands On PT to the present day.

476.   Hands On PT is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.   Hands On PT likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by that Hands On PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

477.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $324,000.00 pursuant to the fraudulent bills submitted by the Defendants through that Hands On PT.

478.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Attya, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(d))

479.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

480.    Hands on Physical Therapy Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

481.    Attya, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the Hands On PT enterprise.

482.    Attya, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Hands On PT enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Hands On PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

105

483. Attya, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

484. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $324,000.00 pursuant to the fraudulent bills submitted by the Defendants through Hands On PT.

485. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Hands On PT, Attya, Trotman and John Doe Defendants 1-5
### (Common Law Fraud)

486. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

487. Hands On PT, Attya, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

488. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Hands On PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Hands On PT was properly licensed, and therefore, eligible to receive No-Fault Benefits

106

pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

489. Hands On PT, Attya, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hands On PT that were not compensable under the No-Fault Laws.

490. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $324,000.00 pursuant to the fraudulent bills submitted by the Defendants through Hands On PT.

491. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

492. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

### NINETEENTH CAUSE OF ACTION
### Against Hands On PT, Attya, Trotman and John Doe Defendants 1-5
### (Unjust Enrichment)

493.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

494.    As set forth above, Hands On PT, Attya, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

495.    When GEICO paid the bills and charges submitted by or on behalf of Hands On PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

496.    Hands On PT, Attya, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

497.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

498.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $324,000.00.

### TWENTIETH CAUSE OF ACTION
### Against Jou, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

499.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

500.    Top Tap Acupuncture, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

501.    Jou, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Top Tap Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than twenty-two months seeking payments that Top Tap Acu was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

502.    Top Tap Acu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jou, Trotman and John Doe Defendants 1-5 operated that Top Tap Acu, inasmuch as that Top Tap Acu never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for that Top Tap Acu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a

threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through that Top Tap Acu to the present day.

503.   Top Tap Acu is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.   Top Tap Acu likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by that Top Tap Acu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

504.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $134,000.00 pursuant to the fraudulent bills submitted by the Defendants through that Top Tap Acu.

505.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Jou, Trotman and John Doe Defendants 1-5**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

506.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

507.   Top Tap Acupuncture, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

508.   Jou, the Trotman and John Doe Defendants 1-5 are employed by and/or associated with the Top Tap Acu enterprise.

509.   Jou, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Top Tap Acu enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Top Tap Acu was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

510.   Jou, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

511.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $134,000.00 pursuant to the fraudulent bills submitted by the Defendants through Top Tap Acu.

512.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5**
**(Common Law Fraud)**

513.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

514.   Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

515.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Top Tap Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Top Tap Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were

112

medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

516.    Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Top Tap Acu that were not compensable under the No-Fault Laws.

517.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $134,000.00 pursuant to the fraudulent bills submitted by the Defendants through Top Tap Acu.

518.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

519.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

### TWENTY-THIRD CAUSE OF ACTION
**Against Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5**
**(Unjust Enrichment)**

520.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

521.   As set forth above, Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

522.   When GEICO paid the bills and charges submitted by or on behalf of Top Tap Acu for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

523.   Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

524.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

525.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $134,000.00.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Jou, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

526.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

527.   Jubilee Star Acupuncture, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

528.   Jou, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Jubilee Star Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments

114

that Jubilee Star Acu was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

529.   Jubilee Star Acu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jou, Trotman and John Doe Defendants 1-5 operated that Jubilee Star Acu, inasmuch as that Jubilee Star Acu never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for that Jubilee Star Acu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through that Jubilee Star Acu to the present day.

530.   Jubilee Star Acu is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned

and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.   Jubilee Star Acu likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by that Jubilee Star Acu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

531.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $248,000.00 pursuant to the fraudulent bills submitted by the Defendants through that Jubilee Star Acu.

532.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against Jou, Trotman and John Doe Defendants 1-5**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

533.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

534.   Jubilee Star Acupuncture, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

535.   Jou, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the Jubilee Star Acu enterprise.

536.   Jou, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Jubilee Star

Acu enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Jubilee Star Acu was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

537.    Jou, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

538.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $248,000.00 pursuant to the fraudulent bills submitted by the Defendants through Jubilee Star Acu.

539.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-SIXTH CAUSE OF ACTION
### Against Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5
### (Common Law Fraud)

540.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

541.   Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

542.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Jubilee Star Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Jubilee Star Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every

118

claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

543. Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jubilee Star Acu that were not compensable under the No-Fault Laws.

544. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $248,000.00 pursuant to the fraudulent bills submitted by the Defendants through Jubilee Star Acu.

545. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

546. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5
### (Unjust Enrichment)

547. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

548. As set forth above, Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

549.    When GEICO paid the bills and charges submitted by or on behalf of Jubilee Star Acu for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

550.    Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

551.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

552.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $248,000.00.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Li, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

553.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

554.    BNL Acupuncture, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

555.    Li, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of BNL Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than eleven months seeking payments that BNL Acu was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in

unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

556.   BNL Acu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Li, Trotman and John Doe Defendants 1-5 operated that BNL Acu, inasmuch as that BNL Acu never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for that BNL Acu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through that BNL Acu to the present day.

557.   BNL Acu is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.  BNL Acu likewise is engaged in inherently unlawful acts inasmuch

as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by that BNL Acu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

558.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted by the Defendants through that BNL Acu.

559.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Li, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(d))

560.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

561.    BNL Acupuncture, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

562.    Li, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the BNL Acu enterprise.

563.    Li, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of BNL Acu enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that BNL Acu was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated

and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

564.   Li, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

565.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted by the Defendants through BNL Acu.

566.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
### Against BNL Acu, Li, Trotman and John Doe Defendants 1-5
### (Common Law Fraud)

567.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

568.   BNL Acu, Li, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

569.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that BNL Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that BNL Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

124

570.   BNL Acu, Li, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BNL Acu that were not compensable under the No-Fault Laws.

571.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted by the Defendants through BNL Acu.

572.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

573.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

## THIRTY-FIRST CAUSE OF ACTION
### Against BNL Acu, Li, Trotman and John Doe Defendants 1-5
### (Unjust Enrichment)

574.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

575.   As set forth above, BNL Acu, Li, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

576.   When GEICO paid the bills and charges submitted by or on behalf of BNL Acu for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

577.   BNL Acu, Li, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

578. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

579. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $170,000.00.

## THIRTY-SECOND CAUSE OF ACTION
### Against Hershkowitz, Trotman and John Doe Defendants 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

580. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

581. Therapeutic Chiropractic Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

582. Hershkowitz, Trotman and John Doe Defendants 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Therapeutic Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than three years seeking payments that Therapeutic Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the

126

level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9."

583.    Therapeutic Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Hershkowitz, Trotman and John Doe Defendants 1-5 operated Therapeutic Chiro, inasmuch as that Therapeutic Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Therapeutic Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Therapeutic Chiro to the present day.

584.    Therapeutic Chiro is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.  Therapeutic Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Therapeutic Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

127

585. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $379,000.00 pursuant to the fraudulent bills submitted by the Defendants through Therapeutic Chiro.

586. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-THIRD CAUSE OF ACTION**
**Against Hershkowitz, Trotman and John Doe Defendants 1-5**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

587. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

588. Therapeutic Chiropractic Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

589. Hershkowitz, Trotman and John Doe Defendants 1-5 are employed by and/or associated with the Therapeutic Chiro enterprise.

590. Hershkowitz, Trotman and John Doe Defendants 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Therapeutic Chiro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Therapeutic Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful kickback and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary; (iv)

the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for-services were performed pursuant to improper referral and financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9."

591.    Hershkowitz, Trotman and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

592.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $379,000.00 pursuant to the fraudulent bills submitted by the Defendants through Therapeutic Chiro.

593.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5
### (Common Law Fraud)

594.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

595.    Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and

concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

596. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Therapeutic Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Therapeutic Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements and fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

597. Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Therapeutic Chiro that were not compensable under the No-Fault Laws.

598.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $379,000.00 pursuant to the fraudulent bills submitted by the Defendants through Therapeutic Chiro.

599.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

600.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems

### THIRTY-FIFTH CAUSE OF ACTION
**Against Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5**
**(Unjust Enrichment)**

601.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

602.   As set forth above, Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

603.   When GEICO paid the bills and charges submitted by or on behalf of Therapeutic Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

604.   Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

605.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

606.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $379,000.00.

## JURY DEMAND

607.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $80,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $80,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.   On the Fourth Cause of Action against ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $80,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against ARA Medical, Dr. Hussain Ahmed, Trotman and John Doe Defendants 1-5, more than $80,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $71,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.     On the Seventh Cause of Action against Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $71,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $71,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.     On the Ninth Cause of Action against Ahmed Medical, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5, more than $71,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.     On the Tenth Cause of Action against the Fraudulent Dr. Shaikh Ahmed Practice, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $32,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.     On the Eleventh Cause of Action against the Fraudulent Dr. Shaikh Ahmed Practice, Dr. Shaikh Ahmed, Trotman and John Doe Defendants 1-5, more than $32,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

L.     On the Twelfth Cause of Action against Attya, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $281,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.     On the Thirteenth Cause of Action against Attya, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $281,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.     On the Fourteenth Cause of Action against Horizon PT, Attya, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $281,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.     On the Fifteenth Cause of Action against Horizon PT, Attya Trotman and John Doe Defendants 1-5, more than $281,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

P.     On the Sixteenth Cause of Action against Attya, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $324,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

134

Q. On the Seventeenth Cause of Action against Attya, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $324,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R. On the Eighteenth Cause of Action against Hands On PT, Attya, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $324,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S. On the Nineteenth Cause of Action against Hands On PT, Attya, Trotman and John Doe Defendants 1-5, more than $324,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

T. On the Twentieth Cause of Action against Jou, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $134,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U. On the Twenty-First Cause of Action against Jou, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $134,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V. On the Twenty-Second Cause of Action against Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $134,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W. On the Twenty-Third Cause of Action against Top Tap Acu, Jou, Trotman and John Doe Defendants 1-5, more than $134,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

X. On the Twenty-Fourth Cause of Action against Jou, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $248,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y. On the Twenty-Fifth Cause of Action against Jou, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $248,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Z. On the Twenty-Sixth Cause of Action against Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $248,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA. On the Twenty-Seventh Cause of Action against Jubilee Star Acu, Jou, Trotman and John Doe Defendants 1-5, more than $248,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

BB. On the Twenty-Eighth Cause of Action against Li, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $170,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.    On the Twenty-Ninth Cause of Action against Li, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $170,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

DD.    On the Thirtieth Cause of Action against BNL Acu, Li, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $170,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.    On the Thirty-First Cause of Action against BNL Acu, Li, Trotman and John Doe Defendants 1-5, more than $170,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.    On the Thirty-Second Cause of Action against Hershkowitz, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $379,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.    On the Thirty-Third Cause of Action against Hershkowitz, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $379,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.    On the Thirty-Fourth Cause of Action against Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $379,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

II.     On the Thirty-Fifth Cause of Action against Therapeutic Chiro, Hershkowitz, Trotman and John Doe Defendants 1-5, more than $379,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated: May 11, 2018

RIVKIN RADLER LLP

By: _____
      Michael A. Sirignano (MS 5263)
      Barry I. Levy (BL 2190)
      Priscilla D. Kam (PK 1505)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

138